[No. 29604. *En Banc.* April 8, 1946.]

THE STATE OF WASHINGTON, *Respondent,* v. RUDOLPH CHESTER ROBINSON, *Appellant.*[1]

[1]Reported in 167 P. (2d) 986.

*Monheimer, Schermer & Mifflin,* for appellant.

*Lloyd Shorett, Max R. Nicolai,* and *James D. McCutcheon, Jr.,* for respondent.

SIMPSON, J.—Defendant was charged by the prosecuting attorney of King county by information which contained two counts, one of rape and the other of assault in the second degree. Trial to a jury resulted in a verdict of not guilty of the crime of rape and guilty of the crime of assault in the second degree. Motion for new trial was presented

but not passed upon by the trial court, except that he wrote on the bottom of an order to deny presented by the state, "refused by the Court."

The assignments relate to the refusal on the part of the trial court to strike the charge relating to second-degree assault; to permit cross-examination of certain witnesses called by the state; refusal to allow the introduction of evidence by appellant; refusal to grant a motion for mistrial; the admission of certain exhibits; and the allowance of cross-examination of witnesses called to testify as to appellant's reputation.

Appellant does not contend that the evidence was insufficient to support the verdict, hence it is not necessary to recount any of the facts other than those which relate to the questions raised by him.

At the beginning of the trial, appellant moved to strike that portion of the information which charged second-degree assault. The motion was denied. The facts upon which appellant based his motion are these: About four weeks prior to the filing of the information in this case, appellant was charged with assault in the second degree in one of the justice courts in Seattle. Thereafter the charge was reduced to assault in the third degree and then dismissed upon the state's motion.

It is appellant's contention that, when the original charge was reduced to third-degree assault, the former charge became merged therein, and the dismissal thereof was a bar to further prosecution in the superior court. He cites *State v. Durbin,* 32 Wash. 289, 73 Pac. 373, as authority for his contention. In that case, the court held that the voluntary dismissal of an information for assault and battery was a bar to a conviction of assault under a subsequent information. That holding, as pointed out in *State v. Wilson,* 130 Wash. 444, 227 Pac. 850, was based upon Bal. Code, § 6916, which read:

"An order for dismissal as provided in this chapter is a bar to another prosecution for the same offense if it be a misdemeanor; but is not a bar if the offense charged be a felony."

And, as further pointed out in the case just cited, the present statute provides for a bar as to a misdemeanor where the former information charged the same misdemeanor. The court then said:

"Manifestly, the purpose of the present statute is to forbid the prosecution for the same misdemeanor charged in the first information; for illustration, the prosecuting attorney may not charge one with possession of intoxicating liquor, dismiss the charge and file another information for possession of the same liquor. This is the conclusion to which we came in *State v. Wickstrom,* 92 Wash. 503, 159 Pac. 753, where, speaking of the present statute, we said:

" ' . . . it bars a prosecution when the second prosecution is for the same misdemeanor or gross misdemeanor with which a defendant had been previously charged and the action dismissed.'

"Speaking of the case of *State v. Durbin, supra,* we further said:

" 'The statute upon which that case was based is general in its terms, while the present statute is specific and definite, and provides in express language when a dismissal will work a bar and when it will not. The difference in the language in the two statutes is such that the holding in that case would not now be controlling.' "

It is clearly apparent that the *Durbin* case is not in point and that the present statute, Rem. Rev. Stat., § 2315 [P. P. C. § 120-21] which was in effect at the time the *Wilson* case was decided, does not apply for the reason that the charge in the justice court could only be for a misdemeanor, while the charge in the superior court was for a felony. This holding is not contrary to our decision in *State v. Voelker,* 137 Wash. 156, 242 Pac. 6, in which this court decided that the dismissal of the charge of a misdemeanor in the justice court was a bar to a prosecution of the same charge in the superior court.

█ The next error of which appellant complains has to do with the refusal of the court to allow cross-examination of some of the witnesses called by the state. These witnesses were deputy sheriffs of King county who testified that they searched appellant's car and found therein several combs and earrings. Counsel for appellant on cross-

examination then asked several questions relative to a search they had made of appellant's home. The court sustained the state's objection based upon the ground that the witnesses had not been interrogated as to a search of appellant's place of abode. The trial court was entirely correct in its holding. The state limited its questions to the search of appellant's automobile. Therefore, appellant was limited in his cross-examination to what occurred when the car was being searched.

Appellant contends, however, that he had a right to cross-examine concerning other acts of the deputy sheriffs to show their bias and ill-feeling towards appellant. The scope and extent of cross-examination to show the bias or interest of a witness is largely within the discretion of the trial court, and its ruling will not be disturbed unless the discretion has been abused. *State v. Temby,* 172 Wash. 131, 19 P. (2d) 661; *Moffitt v. Goldcamp,* 195 Wash. 75, 79 P. (2d) 695. We find that the court properly exercised its discretion relative to the cross-examination.

The next assignment of error concerns the direct examination of the deputy sheriffs by appellant's counsel when they were called as witnesses for the defense, and the admission in evidence of a gas gun, three liquor permit cards, and a railway switch key found by the officers in appellant's home. The evidence and the court's rulings are best shown by quoting from the statement of facts. Counsel examined deputy sheriff Anderson as follows:

"Q. The morning of the 21st of July, 1944, did you go to Mr. Robinson's cabin in your capacity as deputy sheriff? A. Right. Q. Who accompanied you? A. Walter Kerr. Q. Who is he? A. A deputy sheriff. Q. Did you search the cabin? A. We searched the cabin, yes. Q. This was the 21st of July, 1944? A. In the morning. Q. What did you take from the cabin? A. Well, we took several articles. Q. What were they? A. One was a gas gun, and a Southern—or, Northern Pacific switch key, and several liquor permits. Q. What else? A. Some envelopes in the box with the liquor permits. We took them along. Q. Did you have a search warrant? A. No sir."

914

Cross-examination:

"Q. What was the object of you going out there to his car and cabin? A. Looking for evidence. Q. And you mentioned a gas gun when Mr. Schermer asked you. What kind of a gas gun was it? MR. SCHERMER: Objection, it is immaterial. THE COURT: He may answer. A. Well, it was a thirty-two calibre. Q. What does that shoot? . . . Q. What does this gas gun shoot? A. Well, it shoots the same size shells as a thirty-two revolver. Q. What would it shoot in the shell? A. Gas. Q. What kind of gas? MR. SCHERMER: Ask if he knows. Q. Do you know what kind of gas is shot—A. No, I don't. MR. SCHERMER: You understand my objection runs to all of this. Q. You don't know what kind of gas? I don't mean the technical term. Do you know the popular name? A. Tear gas. Q. And now, you mentioned a Northern Pacific switch key? MR. SCHERMER: Same objection. THE COURT: Same ruling. MR. SCHERMER: Exception. Q. What will these switch keys open? A. Railroad switches. Q. Anything else. A. Not that I know of. Q. You say you found some liquor cards there? A. Yes. Q. Whose liquor cards were they? A. Well—MR. SCHERMER: Same objection. MR. SHORETT: May I withdraw that? Did they have the defendant's name on them? A. One did. Q. How many did you find? A. Four. Q. How about the other three? MR. SCHERMER: Same objection. THE COURT: He may answer. A. There were three of them with women's names on them, made out to them. Q. What were the people's names? MR. SCHERMER: Women's names, he said. . . . Q. Will you step down here? Do you understand how this gun works? A. I don't, no. Q. Just sit back then. Handing you State's Exhibit No. 10, for identification, will you state what that is? A. That is a switch key. Q. Where did you find that? A. That was in a box on the kitchen table. Q. In whose house? A. In Mr. Robinson's house. Q. On this particular occasion when you went out there? A. Yes. MR. SHORETT: I offer State's exhibit No. 10. MR. SCHERMER: Same objection,—no relevancy. It is simply offered to prejudice the jury. THE COURT: State's Exhibit No. 10 may be admitted. Objection overruled."

The cross-examination of deputy sheriff Kerr was as follows:

"Q. Have you ever worked for a railroad company? A. Yes. Q. What company? A. The Northern Pacific

and the Milwaukee. Q. Do you know what a railroad switch key is? A. Yes. Q. Do you know what a railroad switch key of the Northern Pacific unlocks? A. Many things. Q. Tell what they unlock. Mr. Schermer: Object as being grossly prejudicial. It is speculative and has no possible probative bearing in this case and is introduced for the sole purpose of prejudicing the jury. The Court: I think you better refer to the Exhibit. The objection will be sustained unless he is shown the key. Q. Do you know what State's Exhibit No. 10 is? A. I do. Q. What is it? A. A Northern Pacific switch key. Q. And do you know what that key will unlock? A. Well, as I said before, it will unlock many things,—any building or any switch locked with a Northern Pacific padlock."

■ ■ The admission of the exhibits was erroneous, as was the allowance of the cross-examination touching the use of the gas gun and the switch key. Weapons or other articles not used in the commission of a crime are inadmissible. *State v. Lloyd,* 138 Wash. 8, 244 Pac. 130; *State v. Hiatt,* 187 Wash. 226, 60 P. (2d) 71. As argued by counsel for appellant, the testimony elicited by the state in describing the exhibits was highly inflammable, far beyond the scope of any proper examination, and could only result in prejudicing the jury against the appellant. The greatest stretch of human imagination cannot bring to life in any manner a connection between the exhibits and the crimes charged in the information. It was reversible error to admit the articles in evidence and to allow the extensive examination touching their use.

■ The last error urged by appellant relates to the cross-examination of several witnesses called by him who testified to his good reputation. In cross-examination, the witnesses were asked the following question by the prosecuting attorney:

"Q. Have you heard it said that the defendant, Rudolph Robinson, on or about April 24th of this year, attacked and attempted to rape Doris Hagen at her apartment at 2043 Renton Highlands?"

In each instance, counsel for appellant properly objected

to the question and excepted to the court's action in overruling the objection.

The question raised by appellant is foreclosed by the decision of this court in *State v. Stilts,* 181 Wash. 305, 42 P. (2d) 779. In that case appellant had called several witnesses who had testified to his good character. The prosecuting attorney was then allowed to ask one witness over appellant's objection "if he did not know that appellant was selling narcotics to high-school children, or was reported to have been making such sales." In holding that the trial court did not commit error in allowing the questions to be asked and the answers given we stated:

"On cross-examination of a character witness, the latter can be interrogated as to his knowledge of the defendant's acts and whether or not the witness has information to the effect that the defendant has been guilty of some misconduct. Appellant himself put his character in issue by calling witnesses who testified that it was good. In cross-examining these witnesses, the state did not transcend the bounds of legitimate interrogation, as defined by this court in the cases of *State v. Austin,* 83 Wash. 444, 145 Pac. 451, and *State v. McMullen,* 142 Wash. 7, 252 Pac. 108."

In so deciding, this court followed the holdings of the majority of courts in this country. The cases are listed in 71 A. L. R. 1504.

Respondent contends that, in any event, the errors committed by the court do not entitle appellant to a new trial and cites as authority *State v. Moody,* 7 Wash. 395, 35 Pac. 132, and *State v. Redwine,* 23 Wn. (2d) 467, 161 P. (2d) 205. In the first case just cited, defendant was charged with the crime of murder in the first degree and convicted of manslaughter. This court held that error had been committed in the trial of the case, but that it did not require a reversal because of the fact that the evidence submitted by the defendant showed that he was guilty of the crime of manslaughter. It is clear that the case is not of aid to respondent.

The *Redwine* case, *supra,* discloses a situation far different from that present in the *Moody* case. In the *Redwine* case,

this court adopted a rule foreign to any in the English-speaking world. The statement of the rule as applied to conceded error, was as follows:

"Unless we can say, after a careful perusal of the record, that had the statement been excluded the jury would probably not have rendered a different verdict, the admission of the evidence will be held to have been prejudicial."

We are now of the opinion that we were in error in adopting the rule just quoted. It is highly improper for courts, trial or appellate, to speculate upon what evidence appealed to a jury. Jurors and courts are made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors. The state attempts to safeguard the life and liberty of its citizens by securing to them certain legal rights. These rights should be impartially preserved. They cannot be impartially preserved if the appellate courts make of themselves a second jury and then pass upon the facts. One of the first propositions of the orderly administration of the law is that a defendant, either guilty or innocent, shall be accorded a fair trial. The fact that this or the trial court may consider the accused to be guilty in no wise lessens the court's duty to see that he has a fair trial. A fair trial implies among other things that the court exclude all evidence that has no material bearing on the case. The holding in the *Redwine* case to which we have just referred is overruled.

Our conclusion that the court committed reversible error demands that the defendant be accorded a new trial. It is so ordered.

DRIVER, C. J., BEALS, MILLARD, and BLAKE, JJ., concur.

STEINERT, J. (dissenting)—The majority opinion reverses the judgment of conviction, solely upon the ground that the trial court erred in permitting the deputy sheriffs, on cross-examination by the state, to testify concerning the description and uses of a gas gun, a switch key, and four liquor permits, which the officers had seized during their

search of appellant's home, and in admitting in evidence those articles as exhibits in the case. It is not now contended that the articles should not have been admitted because the search itself was illegal, but simply that the evidence above referred to was altogether inadmissible and that its admission constituted prejudicial, and therefore reversible, error. I am unable to agree with that contention or with the conclusion reached by the majority. In my opinion, the evidence was admissible; and, further, even though inadmissible, its admission did not constitute prejudicial error calling for a reversal of the judgment.

A general statement of the case should precede a consideration of the rulings made by the trial court.

By information consisting of two counts, the appellant was charged with the crime of rape and with the crime of assault with intent to commit rape, both acts being alleged to have been perpetrated as part of, or connected with, the same transaction. The jury returned a verdict of not guilty on the first charge, rape, but guilty on the second charge, assault with intent to commit rape.

Narrated as of the time of the trial, the evidence on which the state relies is, in substance, as follows: Appellant is a married man, thirty-seven years of age, five feet ten inches tall, weighing about one hundred seventy pounds, and muscular. He does considerable bowling and attends dances about once a week. He came from Rugby, North Dakota, a few years ago and has since been employed at the Boeing airplane plant located in Renton. His wife and thirteen-year-old son reside permanently in Rugby, although they spent about six months with appellant in Washington during the year 1943, living in a cabin in Kent during that period.

The prosecuting witness, who will be referred to herein as the prosecutrix, or, else, simply by the name of Arlyne, is nineteen years of age, and is the second youngest of eighteen children. She came with her parents from Wyoming to Seattle in 1943, and sometime thereafter secured employment in the Boeing plant, where she became acquainted with the appellant, through a mutual girl friend.

On several occasions prior to the particular events here involved, appellant attempted, first through the mutual girl friend, and then by direct personal approach, to secure an evening engagement with the prosecutrix. On each occasion, however, she declined. Finally, on the afternoon of July 14, 1944, appellant met Arlyne as they both were leaving work, and suggested to her that they go out to a dance that evening. She was at first hesitant, but, after some persuasion on his part, she consented to go, and it was agreed between them that he should call for her that evening at the home of the girl friend, where Arlyne was spending the week while her parents, with whom she was living, were seeking another place of residence.

Appellant called that evening at about eight fifteen o'clock, bringing with him in his automobile a bottle of whisky and several bottles of coca cola. During his short stay at the place, appellant produced the liquid refreshments and took a drink of whisky mixed with coca cola, while the girls each drank a glass of "coke." Appellant and Arlyne then left about 8:45 p. m. and drove as far as Auburn, where he took her to a "bottle-club," of which he was a member, but which she had never visited or seen before. There he ordered for himself two whisky cokes and for her a "Zombie," which is a concoction of fruit juices and rum, mixed in a ten-ounce glass. The drink appeared mild to Arlyne because, as she said, "it didn't burn."

There was no dancing at that place, however, and, when Arlyne remarked upon that fact, appellant said they would go somewhere else for that purpose. They then resumed their journey by automobile and at appellant's suggestion drove to Puyallup, where Arlyne had never been.

Arriving in Puyallup, they went to a dance hall, where they remained until nearly midnight. During that period of entertainment, appellant ordered and drank several glasses of wine. At his insistence, Arlyne drank a small portion of wine from one of the glasses, and he imbibed the rest of it. They danced several times, and on two occasions between dances he persuaded her, upon one excuse or another, to go out and sit with him in the automobile a

while. On these occasions, while in the automobile, appellant drank more whisky and at the same time endeavored to get her to drink with him. She refused. He then began making improper advances by endeavoring to kiss her and feel her legs. She testified that she repulsed him; he admitted that she was not "overly responsive," although he stated that he did succeed in kissing her once or twice and putting his hand on her leg.

Shortly after their final return to the dance hall, Arlyne complained of being tired and expressed the desire to go home. He in the meantime had become much dissatisfied at not being able to make better progress with her and complained that she was a "wet rag." For contrary reasons, the evening had thus far been a disappointment to both of them.

They started homeward, and, on the trip, appellant from time to time consumed more whisky and became more insistent in his improper advances. She repeatedly repulsed him, but endeavored to do so in such a way as would not too greatly arouse the ire that he was already displaying. Her chief thought was to get home safely. After passing through Auburn, where they had stopped a few minutes to give the automobile some needed attention, they proceeded toward Renton. On the way, he endeavored to persuade her to accompany him on to Seattle for more dancing, but she declined.

Between Auburn and Renton, appellant turned his automobile into a side road, under the pretext that it was a short cut to Renton. After going a short distance, appellant brought the car to a stop, and Arlyne inquired of him what was the matter. Appellant responded by saying "I am going to take some of the conceit out of you and right now," and at the same time made a "beastly dive" for her. After pushing open one of the doors of the automobile, he flung himself upon her, forcing her down upon the seat, with her head underneath the steering wheel. A fierce struggle ensued, she resisting with all her strength, at the same time screaming and begging him to desist, and he swearing at her, calling her vile names, striking her upon the face and

body, punching her in the ribs, tearing her dress, and loosening her under garments. Pinning her arms underneath her back, and exposing himself, he brought the matter to a climax by raping her. She testified that she could feel his person entering her and describing the soiled condition of her body after he had completed the act.

Appellant then drove the automobile back upon the highway and continued toward Renton. During that portion of the trip, he forced the prosecutrix to lie with her head on his lap underneath the steering wheel, in order that he might further kiss and fondle her. All this time she was crying. In a short while, he again drove off the highway onto a side road and stopped. There he began another assault, striking, beating, and vilifying her as before, and again accomplishing the same result. She testified:

"A. Yes, I was crying and he told me to be quiet or he would attack me again. I tried to calm down. He said 'Lay your head on my lap or I will really finish you.' I refused and he grabbed me by the hair and pulled me on his lap. Q. How long did he keep you there? A. I would say fifteen or twenty minutes. Q. Tell the jury what happened after that. A. He stopped the car again. I got up and looked out and I said 'Where is this?' He didn't answer. He turned on me again like a beast."

Finally, appellant took the prosecutrix to Renton, letting her out near her sister's home, where she had asked to be taken. This was about one-thirty o'clock in the morning. The sister testified to the prosecutrix' physical condition when she gained admittance into the house, crying hysterically and complaining of what had been done to her by the appellant. The girl friend, from whose house Arlyne had started upon the trip and who saw her the next day, also testified to the black and blue marks seen on various parts of Arlyne's body and the swollen condition of her face.

Appellant told a remarkable story concerning the events of the evening. He said that on the way to Puyallup he and Arlyne exchanged a number of smutty stories; that he thereupon began taking liberties with her; and that while she did not respond favorably to him, "she didn't sincerely

object." He also testified that, while sitting in the automobile, in Puyallup, he tried several times to kiss her and feel her breast and legs.

"When I first kissed her she was not overly responsive. She didn't jump at me. I kissed her and put my hand on her leg. Then I put my hand up on her breast. She said 'don't do that, that hurts.' I said 'I am sorry' and put my hand back on her leg. Before then she didn't tell me I couldn't put my hand on her leg but she was not overly anxious to let me do it. I said 'Lets go back in the dance hall.' "

More remarkable still was appellant's version of what took place later. After denying that he had done anything other than kiss and fondle the prosecutrix during the first instance of the alleged attack, he recounted what took place on the second instance, as follows:

"A. It is on the road that leads to North Bend. I pulled in there and stopped. I had never parked there before. It was in far enough and in a dark place that if a car was coming up that road they could not see you and if coming down they could just get a flash. I pulled up and she said 'Where are we?' I said 'I don't know.' My idea was she knew it was practically on the way home. We had to go on the highway going home. . When we turned off she was sitting in the front seat and I started loving her up. I went through the performance of taking off her girdle. I took it off and during the performance she never used her hand to try to stop me. When I took it off I folded it and put it on the windshield, on the visor on her side. I said to her 'What about raising up a minute and I will scoot underneath.' When I was under her she was over on the side where I was with her legs across me. She was sitting to my left. I was sitting there loving her up, putting my hands underneath her dress. She didn't have on the girdle. Then I thought 'The girl is willing to have intercourse.' So I did lay her down. I didn't force her down. She moved over—I cannot hardly explain it. I didn't push her down underneath the wheel. Q. Did you strike her? A. I did not. Q. Did you beat her? A. I did not. Q. Did you slap her? A. I did not. I opened the door prior to this and moved her or kind of scrotched her over on the side where I was and I started getting ready for this intercourse, which I thought she wanted to do. She was lying

underneath the wheel now in this car of mine, in the front seat. I lifted her left leg. I took the leg and put her leg on the cowling, the edge of the windshield at the door. Her leg was slightly bent like this (indicating). This leg was on the door jamb. I really thought this girl was in a mood she was going to play. I didn't ask her to but I assumed she was going to have this intercourse. I started to open the fly of my trousers and was practically ready to do this and she kind of winched, contracted her legs, and screamed. I said 'There is nothing to be frightened of. I have no rubbers but there is nothing to be frightened of.' She straightened her legs and pushed back in the car. When she pushed I had my right hand in back of her, my other hand free. I had my arm on the steering wheel. It pushed me a little out of the car. I said 'What is the matter?' She said 'You are not going to . . .', I said 'What do you mean?' She said 'I have never been made.' I said 'You would not kid me?' and she said 'All my life all I have ever held dear to me is I am going to be a virgin until I am married.' I had kept company in Boeings with a very good friend and she was her boss. I had been out with her many times bowling. Here I was. I was embarrassed. I was at a loss for words. I said 'I don't believe it.' She said 'I have never been made.' I said 'I don't know.' I was at a loss for words. I was dumfounded. I said 'You mean to tell me you don't play around?' She said 'No, I have never played around in my life.' It was kind of a bad place for me to be in. I said 'You are sure?' I was still laying on the girl, kind of resting on my elbow. I said 'You mean to tell me you never played around?' I was practically dumfounded on this deal. I didn't make a move to get off or to advance. I didn't know what the situation was and I thought 'Here is this situation, here is this girl. I go with a girl in the plant. I have been out and this girl tells me this,' and I thought 'It is good enough for me.' I said 'You are not kidding?' and she said 'no, I don't want to play around.' I said 'If you don't want to play around, to Hell with you.' I backed away from her. Her feet were sticking out of the door. She had not sat up. I slammed the door and zipped up my pants. I was mad, really mad, and embarrassed. . I got in the car and said 'Fine evening, is it not?' She said 'I don't know what is fine about it.' I said 'Well, you had a good dance, did you not? She said 'Well, the dance was alright.' I said, 'What about the liquor?' She said 'I don't know, this sure don't compensate me for my

evening.' I said 'Compensate, Hell, you have not been hurt.' She said 'What do you mean?' I said 'As far as I am concerned you have not been hurt.' I was sitting crossways with my feet in the seat and she was by the door and I said 'I have not hurt you' and we kept talking back and forth. I said 'If you didn't want me to play around with you why didn't you give some sign. After all, I don't have to chippie around and grab people.' She said 'You were holding me.' I said 'When did you show any resistance?' She said 'The first time you stopped.' I said 'What did you do?' She said 'The first time you unfastened my garter.' I said 'You had your hand around my neck.' She said 'Is this the way you treat all the girls when you go out?' I said 'What do you think.' She said 'Is this the way you treat Dotty?' I said 'Just a minute, Dotty Smith is nice.' She said 'I suppose I am not nice.' I said 'I wouldn't know, perhaps you are.' She said 'What did you take me out for?' I said 'I took you out to dance. I could not be any nicer than you allowed me to be.' She said 'You forced me.' I said 'I didn't force you, if I forced you why didn't I slap you or scare you?' She said 'I am scared.' We sat and argued and argued. She was trying to blame me. I thought all the time 'She is going back to this plant at Boeings and say something or other.' I have lots of friends at Boeings. I have a speaking acquaintance with five hundred people. I was trying to make her concede she was not hurt. She convinced me and I absolutely thought she was a virgin. I absolutely thought that was true then as far as I was concerned. We sat and argued and I said 'After all, I was just as nice as you allowed me to be.' She said 'I didn't say I would' and I said 'That is right, you didn't actually tell me to do anything but why in heck didn't you stop me?' We sat and argued. Then she said 'I thought you said you were going to take me home.' I said 'I am going to take you home and right now.' I backed the car up and put it in intermediate and went up the hill. When we were sitting there arguing I will admit I felt like a heel in respect that I even approached the girl. She convinced me she was nice. I didn't think I would want her to say to my friends in Boeings I was over abusive in taking advantage. We drove and went to the Highlands. She said 'what time is it?' I looked at my watch and said 'It is twenty minutes after one.' I kept driving. She started crying and I said 'What is the matter?' She said 'I cannot go home now.' I said 'What do you mean?' I thought 'Am

I going to be stuck with this girl all night?' I was half-way down the block but not far enough to see if the lights were on in the house. I said 'Where do you want to go?', and she boo-hooed and cried and said—and I was getting madder and madder,—disgusted with the whole evening—I wanted her to make up her mind. She said she would have to go to her sister's place. I said 'That is good enough for me, where is your sister's place?' She said 'You drive and I will tell you.' We started down the road. We made three different turns to get down. We drove down the road. I said 'What about going to work tomorrow?' She said 'Where will I get the clothes?' and I said 'borrow some from your sister.' I said 'Tomorrow is Saturday and over-time.' She said 'I don't know.' About fifty yards from where her house was she started boo-hooing and crying and I was egging her on and I was really mad about everything. I said 'Come on, come on, why don't you fix your face?' I turned the visor over, the car has a mirror, and said 'Why don't you fix yourself up?' She said 'Well, I don't know.' Her purse was in the back seat. I got her purse and said 'Why don't you fix your hair and fix yourself up? You cannot go in the house now.' She took out a handkerchief. I was sitting in the car, looking straight ahead. She didn't talk much. I turned off and she said 'Here is the place.' I said 'Do you feel different?' She said 'I feel different. You don't care how I get in.' I said 'You are home and it is time for you to get out, I am going home.' She said 'forgot to tell you one thing, I didn't have no good time with you this evening.' I reached over and opened the door and said 'Good-bye now.' She got out and went in the house. I don't know if she went in. I backed up the car,—there is a dead end there,—and she was just about to the door when I left. She was just over to the door. When I let her out of the car she was still snickering and boo-hooing and crying."

The purpose of setting forth these sordid details of the evidence is to show the real character of the case that was presented to the jury during a trial lasting a full week, and, in the light of still other evidence adduced by the appellant himself, to test the propriety of the rulings made by the trial court and upon which the majority opinion reverses the judgment of conviction.

In his opening statement to the jury, appellant's counsel announced that he would prove by evidence that the deputy

sheriffs, who had previously testified for the state, had gone to his place of residence, while he was still in jail, and had "rifled" the place; that they were seen leaving the premises "with a box under their arms"; that later approximately eighty dollars in two-dollar bills belonging to him was missing from his cabin; and that his war bonds were found twisted and thrown behind the refrigerator. The purpose of this statement was to impugn the integrity and credibility of the officers who had testified against him on the state's case. Counsel also stated that character witnesses would testify in appellant's behalf.

When appellant took the stand in his own behalf, his counsel, in the early part of the direct examination, asked him whether he had ever been convicted of a crime, to which he readily responded that he had twice been convicted for burglary and once for robbery. Later, in his defense, appellant introduced a number of witnesses who testified that his reputation for truth and veracity and for peace and quietude was good.

Evidently with the idea of discrediting the deputy sheriffs who had previously testified against him, appellant thereafter called them as his own witnesses and established by the testimony of one of them the fact that they had searched appellant's place of residence without a warrant and had taken therefrom "several articles." Not being fully content with that general answer, counsel probed further and elicited from the witness the fact that among the articles taken by the officers were a gas gun, a Northern Pacific switch key, and several liquor permits. The prosecutor, on cross-examination, had the witnesses produce the articles and describe them. This was done over appellant's objection, and of which he now complains as being prejudicial error.

The evidence probably would not have been admissible had it been offered by the state as a part of its case in chief. But the state did not so offer it. The appellant himself opened the subject. Had the articles not been produced and identified, counsel for appellant, in his desire to discredit the deputy sheriffs, could well have argued to the jury that

failure to produce the articles was the best proof that they had not been found in appellant's home. To foreclose that argument, the state was compelled to produce the exhibits. Upon their production, it was certainly proper to describe their mechanism and uses. Having himself taken the chance of opening the subject and having developed the matter toward the point of his objective, appellant cannot complain that the state took advantage of the situation and brought before the jury the full details connected therewith.

An analogous situation was presented in *State v. Gottstein*, 111 Wash. 600, 191 Pac. 766, wherein a charge of murder in the first degree was involved. The facts and the ruling which was upheld by this court in that case are sufficiently presented by quotation of the following paragraph of the opinion:

"The witness Good, when he first read of the disappearance of the deceased, went to the sheriff's office and said in effect that, if the deceased disappeared on Wednesday, there was nothing in what he had to say, but if he disappeared on Friday, then he knew something which might be of assistance in unraveling the mystery, and further intimated that the knowledge which he possessed might cause those guilty to seek to put him out of the way. He then wrote the defendant's name on a slip of paper, sealed it in an envelope and gave it to the deputy sheriff, to be opened only if he, Good, disappeared or when the body of the missing man might be found, saying that, if he were killed or disappeared, the person named on the slip would be responsible. Nothing regarding the writing of the name or the leaving of the envelope was touched upon in the direct examination of the witness Good, but upon cross-examination all of the facts were brought out except only the name written upon the slip of paper, and on redirect examination the paper bearing the defendant's name was, on the state's offer, introduced in evidence. The defendant argues that this was prejudicial. If so, he cannot complain. He took the chance involved in a searching examination of the state's witness, and having developed the facts of the writing of the name and the depositing of it with the sheriff and all the details surrounding it, he cannot now complain, because, under familiar and well settled rules of law, the

state took advantage of what he had developed and placed before the jury that which he had made proper and material."

The admission of the exhibits and the testimony concerning them was, in my opinion, perfectly proper, under the circumstances above shown. Furthermore, I think the evidence was admissible as bearing upon appellant's good character, concerning which appellant had himself introduced testimony.

However, assuming that the evidence here under consideration was inadmissible, its admission should not, in my opinion, be held to constitute prejudicial error calling for a reversal.

It is a rule of practically universal application in appellate procedure that an accused cannot avail himself of error as a ground for reversal where the error has not been prejudicial to him. It is only prejudicial error that calls for reversal. *State v. Hazzard,* 75 Wash. 5, 134 Pac. 514; *State v. Gaines,* 144 Wash. 446, 258 Pac. 508; *State v. Levy,* 8 Wn. (2d) 630, 113 P. (2d) 306; 24 C. J. S. 837, Criminal Law, § 1887.

On the question whether error in the admission of evidence is *presumptively* prejudicial, the authorities are divided. Some of the cases hold that where the record shows that evidence has erroneously been admitted, prejudice will be presumed and that the prosecution has the burden of showing that no prejudice resulted. At least an equal number of cases hold that, although the record shows error in the admission of evidence, the burden rests on the appellant to show that the error was prejudicial to him. The cases on the subject will be found in the footnotes appearing in 24 C. J. S. 845, Criminal Law, § 1888 (b).

It may be taken as a generally accepted rule that the doctrine of harmless error does not apply where the accused has been deprived of some substantial right and that it will not be projected to such an extent as to deprive the accused of a fair trial, or trial on the merits. However, whether the error complained of in a given instance constitutes harmless error on appeal, often, and naturally, depends on

the circumstances of the particular case, rather than on specific rules of law. The general attitude of the courts with respect to the subject is well stated in 24 C. J. S. 841, Criminal Law, § 1887, as follows:

"Accordingly, the appellate courts are disposed to regard as harmless intervening errors where it appears from the record that the conviction is clearly correct on the merits; where it appears on the whole case that substantial justice has been done; where the record shows that accused had a fair trial; where the record conclusively shows that the alleged error could not have resulted in prejudice; where from the whole record the guilt of accused appears to be clearly established; where no other verdict could have been returned on the evidence, and where the conviction was just and would have been reached if the errors had not been committed. So, also, where it can be said from the record that the errors complained of could not reasonably have affected the result of the trial, they may be regarded as harmless, and this particularly where proof of accused's guilt is clear."

Each of the conjunctive statements made in the foregoing quotation, particularly the statement with reference to the situation "where from the whole record the guilt of accused appears to be clearly established," is fully supported by cases cited in the footnotes to the text.

In the recent case of *State v. Redwine,* 23 Wn. (2d) 467, 161 P. (2d) 205, an *En Banc* decision, this court proceeded upon the same view as other courts generally have done, that in determining whether prejudice resulted the whole record of the case must be considered.

In that case, the question was whether a statement which had been made by a third party in the presence of the accused, at the time of the latter's arrest, and not denied or contradicted by him, was admissible on the trial. In presenting the question to be decided, this court said:

"There is a presumption that error of this kind is prejudicial, and in reviewing a case it becomes necessary for the appellate court to give full consideration to the record and make a determination whether the presumption has been overcome and that prejudice did not result."

In resolving the question against the accused in the cited case, we said:

"In cases of this kind, the test as to whether an error in the reception in evidence of a statement of the character before us is to be deemed prejudicial, is this: Unless we can say, after a careful perusal of the record, that had the statement been excluded the jury would probably not have rendered a different verdict, the admission of the evidence will be held to have been prejudicial."

It will be observed that, in the cited case, the court stated the rule in terms of the conditions under which evidence will be held to have been prejudicial, rather than the conditions under which the evidence would be held not to have been prejudicial. It is equally clear, however, that if the language of the prescribed test had begun with the words "If we *can* say," instead of the words *"Unless* we can say," the pronouncement would have been that the admission of the evidence will *not* be held to be prejudicial, for that is the very conclusion that was reached in that case.

In the case at bar, appellant gave an explanation of how the gas gun, switch key, and liquor permits came into his possession. The jury could have believed or disbelieved that explanation. But whether it believed it or not, the jury must be credited with at least a minimum amount of common sense, and with intelligence enough to know that the articles found in appellant's home had nothing to do with appellant's guilt or innocence of the crime charged. The verdict which it rendered shows on its face that the jury exercised discriminating judgment. It found the appellant *not guilty* of rape, the more serious charge, but found him guilty of assault with intent to commit rape, the lesser charge. The jury evidently concluded that appellant had not consummated the offense of rape by actual penetration of his intended victim, and the evidence on that question was of such a nature that the jury might reasonably have come to that conclusion. On the other charge, however, there could be no possible doubt in the mind of any reasonable person as to appellant's guilt, and the evidence of the appellant himself was as near an admission of the charge

as could have been expected. All the other evidence was overwhelmingly in substantiation of the charge. The appellant had a fair trial, and it is inconceivable to me how any sane jury could have come to any other conclusion than that he was guilty of the crime charged in the second count.

I think the judgment of conviction should be affirmed, and I therefore dissent from the majority opinion.

ROBINSON, MALLERY, and JEFFERS, JJ., concur with STEINERT, J.

May 24, 1946. Petition for rehearing denied.

[1] Reported in 167 P. (2d) 997.