147 P.3d 991 (2006)
STATE of Washington, Respondent,
v.
Arthur Jesse DIXON, Petitioner.
No. 77342-4.
Supreme Court of Washington, En Banc.
Argued June 27, 2006.
Decided December 7, 2006.
*992 Eric J. Nielsen, David Bruce Koch, Nielsen Broman & Koch PLLC, Seattle, WA, for Petitioner.
Gary Paul Burleson, Attorney at Law, Monty Dale Cobb, Mason County Prosecutors Office, Shelton, WA, for Respondent.
Arthur J. Dixon, Appearing Pro Se.
OWENS, J.
¶ 1 A jury convicted Arthur Dixon of three counts of child molestation in the first degree, and he was sentenced as a persistent offender.[1] At issue are two trial court rulings concerning the defense's efforts to impeach on cross-examination the child victim, Dixon's then 9-year-old daughter. We are asked to decide whether the trial court erred (1) in refusing to allow the defense to call the victim's counselor, Peggy Zorn, as an impeachment witness and (2) in disallowing cross-examination of N.D. regarding a question about lying that she had allegedly asked her 16-year-old aunt, Amber Hansen.
¶ 2 We find no abuse of discretion in either ruling and therefore affirm the Court of Appeals.

FACTS
¶ 3 Dixon was arrested on November 7, 2001, and charged with three counts of child molestation in the first degree, pursuant to RCW 9A.44.083(1). Each count arose from Dixon's alleged sexual contact with his daughter, N.D. (d.o.b. May 22, 1992). The information alleged that the criminal contact giving rise to the three counts occurred "during the month of December, 2000," "between January, 2001, and October 1, 2001," and "on or about October 12 through 13, 2001." Clerk's Papers at 50-51. The case went to trial in February 2002 in Mason County Superior Court.
¶ 4 At trial, the State called three witnesses: N.D.; her mother, Donna Dixon; and Detective Thomas Adams of the Shelton Police Department. As to the incident alleged in count one, the State elicited testimony from N.D. that, in December 2000, when the family was living on Willapa Road in Shelton, her father molested her early one morning when she accompanied him on his newspaper route. N.D. described seeing her "father's private parts":
A. He says he was only trying to teach me, and he brought it out of his pants and he says this is, this is what this is but I don't know what he said.
. . . .
Q. Okay. Did anything happen with his private parts?
A. Yes.
Q. What?
A. Gooey stuff came out.
Q. What color?
A. A white color.
3 Report of Proceedings (RP) at 256. N.D. disclosed the molestation to her mother that same morning shortly after returning home with her father. Id. at 252. N.D. stated that, after she made the disclosure to her mother, her father said, "it wasn't true," but "I says that he knows it's true, and then I went to my room." Id. N.D. acknowledged *993 that she later told her mother "it didn't happen because he said to me that he was only trying to teach me something." Id.
¶ 5 Donna Dixon's testimony corroborated N.D.'s. She testified that on a Sunday morning in December 2000, Dixon and N.D. returned late from delivering papers and that within an hour of their arrival N.D., appearing hesitant and "nervous," disclosed "that her father had inappropriately touched her [in her private spots] and had an inappropriate conversation with her." Id. at 319, 320. Donna Dixon described N.D.'s disclosure as follows:
She didn't go word for word, but she said, mom, she says daddy said some things that, that were pretty gross, from what I . . . And I says, okay, and she says, they were yucky. And I says, well, what was said. And she said dad  that her father had referred to her lower private area as a pussy and his lower private area as a cock. And that he was trying to teach her that  how the basic, the two of them went together because I wasn't willing to teach her about sex.
Id. at 320. Donna Dixon testified that she asked N.D. if she was telling the truth, and N.D. "was very, very adamantly telling me, yes, that she was telling me the truth." Id. at 324.
¶ 6 Donna Dixon stated that she immediately went upstairs and confronted her husband privately. Although he denied touching N.D., he confessed that he had had the conversation with her and had used the "exact words" N.D. recalled. Id. at 321. Donna Dixon testified that, when she told N.D. that her father had denied touching her, N.D. was "[v]ery angry at first and became extremely withdrawn and then left, left the room and went to her room." Id. at 322. According to Donna Dixon, N.D.'s "only question to [her] was how can he admit to having the conversation without admitting to touching me." Id. Donna Dixon acknowledged indicating to N.D. that Dixon had denied the allegations because he "was just trying to teach her." Id. at 323.
¶ 7 Donna Dixon recounted another conversation that she had with N.D. later that same day:
A. . . . She did come out to me later, still kind of in a withdrawn type state and told me that things  that it didn't happen exactly the way she said. That the touching hadn't happened.
Q. What was her, what was her demeanor?
A. She was very withdrawn, very shaken. She was also very angry, and she was, she was very withdrawn for, for a couple of days.
Id. at 322. Choosing to believe Dixon's denial and to view N.D.'s "retraction" as being more credible than her spontaneous disclosure and adamant assurances of truthfulness, Donna Dixon did not contact the police. Id. at 324.
¶ 8 N.D. made a second disclosure to her mother on Saturday morning, October 13, 2001, when the two were delivering papers. N.D. referred to the December 2000 molestation and described the acts giving rise to counts two and three. As to the crime alleged in count two, N.D. testified at trial that her father molested her after the family moved from Willapa Road to Cascade Street in Shelton. (According to Donna Dixon's trial testimony, the family lived on Cascade from early May 2001 until July 10, 2001, when they moved to Ellinor Avenue.) N.D. stated that her father molested her on the living room couch and in her parents' bedroom. She said that in the bedroom "[h]e took off his clothes and he took off [hers] too" and "got on top of [her]" and that on the couch "[h]e touched [her] private area" "[u]nderneath [her] clothes." Id. at 254, 255.
¶ 9 Regarding the count three incident, Donna Dixon testified that N.D. told her on October 13, 2001, that the incidents occurred "most often on . . . Ellinor on the couch" and that the last incident had occurred just one or two days prior to the disclosure. Id. at 374, 341. N.D. testified at trial that her father "touched [her] in [her] private areas," making her "sore," and that she noticed that afterward "[i]t stung . . . [w]hen [she] went to the bathroom." Id. at 258, 264. She stated that she saw "that gooey stuff" when they were on the couch in the living room, that "[i]t got on the couch cushion," and that *994 he "clean[ed] it up." Id. at 257. Donna Dixon testified that N.D. told her that the last incident had occurred on the living room couch and that Dixon was wearing a bathrobe. Donna Dixon recalled that N.D. told her that Dixon "had white goo come out of his, out of his wiener, and it was on the couch." Id. at 342. When Donna Dixon and N.D. returned home from the paper route, they confronted Dixon. N.D. "looked at him and she says you've been touching me and it needs to stop." Id. at 337. Dixon denied touching her, and when he asked N.D. why she had not told her mother sooner, N.D. "said because you told me that you would hurt her or [my brother]." Id. at 338. Donna Dixon contacted the police two or three days later.
¶ 10 From Donna Dixon, the prosecutor elicited testimony about N.D.'s truthfulness and behavior. Donna Dixon stated that N.D. had lied about small things, such as who ate the last doughnut, and had also lied about some destructive behavior. According to Donna Dixon, within a week or two of the December 2000 disclosure, N.D. cut the cushions and throw pillows on the living room couch, some of Donna Dixon's clothing, and some of her own clothing and books. N.D. denied responsibility, letting her brother take the blame. Ultimately, however, "just before Christmas" of 2001, N.D. admitted her responsibility for the destructive behavior; as punishment, she was grounded and "had to do quite a few of her brother's chores." Id. at 346, 365, 366.
¶ 11 The State's third witness, Detective Adams, relied on the written transcript of his October 16, 2001, interview with N.D. to introduce additional details that she had recounted about the multiple incidents of molestation. For example, Detective Adams told the jury that N.D. had described Dixon's penis as "[s]kin colored, but a little darker, big and disgusting looking." 4 RP at 402-03. Detective Adams also testified that on October 17, 2001, for purposes of deoxyribonucleic acid (DNA) testing at the Washington State Patrol crime lab, he had collected from the Ellinor Avenue house the cushion covers from the living room couch, two diabetic test strips that Dixon had previously used, and an unused strip to serve as a control. Relying on transcripts of his interviews with Dixon on October 19 and November 1, 2001, Detective Adams offered additional testimony, including Dixon's statement that he had masturbated and ejaculated on the living room couches. The State closed its case by reading into the record the crime lab report, which identified a stain on one of the cushions as semen with a DNA profile matching Dixon's.
¶ 12 In the course of the State's case, the defense sought the court's permission to call two impeachment witnesses, Peggy Zorn and Amber Hansen. When defense counsel asked N.D. on cross-examination whether she "remember[ed] talking to Peggy Zorn, a counselor," the State immediately objected. 3 RP at 298. Outside the jury's presence, the trial court ruled that defense counsel could ask N.D. whether she recalled saying to the counselor that she could not tell whether the molestation had actually happened or was a dream:
If she agrees that she made that statement, it doesn't go any further. But if she denies that she made that statement, then the Court is able to rule on whether you can bring in the person who heard that statement so that you can impeach them with the prior inconsistent statement. But then the Court also has to decide[] whether it's a collateral issue, and if it's a collateral issue, then it doesn't come in at all. So I will overrule the objection to the present question about whether or not she recalls talking to Peggy Zorn and whatever she may have said to Peggy Zorn because it would be appropriate for a question regarding prior inconsistent statements if in fact [defense counsel] has some documentation that would support that that was said to her.
Id. at 302-03. When cross-examination resumed, defense counsel asked N.D. about N.D.'s talk with Zorn:
Q. Do you remember telling her that you were very confused about this thing with your dad?
A. I said I was confused because my mom says I might be like dreaming or something. So I said  so that's why I said I was confused.

*995 Q. Do you remember saying I don't know if it happened or if it was a dream?
A. Yes, but I know it wasn't a dream.
Id. at 311-12. The trial court later ruled that N.D.'s admission that she had made the statement to Zorn foreclosed the defense from calling Zorn for impeachment purposes.
¶ 13 Following the initial discussion of the Zorn matter, defense counsel asked the State whether it intended to object if the defense questioned N.D. about statements she had purportedly made to her 16-year-old aunt, Amber Hansen, asking what she should do if she had lied about something. The State objected, and the court deferred its ruling, pending defense counsel's offer of proof that N.D.'s remarks to Hansen pertained to the molestation allegations:
I'm saying that you cannot ask this witness that question until you know for sure that you have a witness that will come in and say, yes, [N.D.] and I spoke on that particular day. We were talking about the sexual touching that was alleged to have occurred, and that's when she brought up the statement about whether she was lying or not. . . . I want to know that that's what the witness is going to say today or tomorrow when she comes in.
Id. at 309.
¶ 14 When called to the stand for an offer of proof, Hansen testified that in December 2001, she had the following conversation with N.D. in N.D.'s bedroom, when the two were coloring:
She said what do I do if I'm lying, and I said you need to tell somebody. She said, well, it's gone too far. And I'm like I don't care, you need to tell somebody. And then she said, well, what do I do if I'm lying. Then my mom came in and said we need to go 'cause my dad needs to go home.
4 RP at 489, 495. Defense counsel asked Hansen to interpret N.D.'s remarks and place them in context:
Q. And what was she talking about?
A. She was talking about her dad or at least that's what I got out of it.
Q. Had you been talking about her father?
A. Yes. In the front room previous to that, we was basically talking around the bush with the parents and me finding out is he [Dixon] coming home for Christmas, what are they gonna do about the Christmas party and stuff like that for the kids.
Id. at 489. According to Hansen, she, her sister Donna Dixon, and their parents were attempting to have the discussion about Christmas plans in such a way that N.D. and her brother, who were also there in the living room, could not follow it.
¶ 15 On cross-examination, Hansen acknowledged that "[N.D.] never said I'm lying about my father" or "I did something I shouldn't have done and I lied about it." Id. at 496. Hansen also affirmed that in the living room "[t]here was never anything said about what the defendant did to [N.D.]," and Hansen confirmed that later that month, on December 22, 2001, she and N.D. had a conversation in which N.D. specifically asked Hansen whether she knew what Dixon had done to her. Id. at 501. Arguing against the defense's offer of proof, the State emphasized that N.D.'s remarks were not tied to the molestation allegations and were likely relevant to N.D.'s December 2001 confession to her mother that she had lied about her destructive behavior the previous December.
¶ 16 The trial court ruled that the defense could not ask N.D. about the statement because the defense had not made an adequate showing that N.D.'s statement pertained to her molestation allegations against Dixon:
Well, the witness is certain of what was said during the period of time that she and [N.D.] were in the bedroom . . . coloring. That's not in dispute. The problem is this witness was not informed of the subject that was in [N.D.]'s head when she was talking about what do I do if, if I were in fact lying. And to jump to that [N.D.] was referring to her dad isn't something that we all can do or the Court would allow us to do because we have nothing concrete to be able to say that that's what this little girl was talking about. We have the surmise, the inference, the conclusion made by this witness that that's what was in [N.D.]'s mind. But we can't allow one *996 witness to speculate on what the other witness is thinking.

Id. at 506-07 (emphasis added).
¶ 17 The defense called no witnesses, and the matter went to the jury on March 1, 2002. Later that day, the jury returned a guilty verdict on each of the three charged crimes. On April 18, 2002, Dixon was sentenced as a persistent offender. As required by statute, he was sentenced on each count to "confinement for life without the possibility of release." RCW 9.94A.570.
¶ 18 Dixon appealed, and the Court of Appeals affirmed in an unpublished opinion. State v. Dixon, noted at 118 Wash.App. 1005, 2003 WL 21916401, 2003 Wash.App. LEXIS 1770. We granted Dixon's petition for review.

ISSUES
¶ 19 (1) Given that on cross-examination the victim admitted making the statement that defense counsel was prepared to introduce with extrinsic evidence, did the trial court abuse its discretion by refusing to permit the defense to call the impeachment witness?
¶ 20 (2) After a prospective impeachment witness failed to confirm in the defense's offer of proof that the victim's prior question about lying concerned the molestation allegations, did the trial court abuse its discretion by refusing to permit the defense to cross-examine the victim about the alleged statement?

ANALYSIS
¶ 21 Standard of Review. Determinations regarding the scope of cross-examination are within the trial court's discretion and will not be overturned on appeal absent an abuse of discretion. State v. Young, 89 Wash.2d 613, 628, 574 P.2d 1171 (1978); State v. Russell, 125 Wash.2d 24, 92, 882 P.2d 747 (1994). We have described the abuse of discretion standard as follows:
The reviewing court will find an abuse of discretion "when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." A decision is based "on untenable grounds" or made "for untenable reasons" if it rests on facts unsupported in the record or was reached by applying the wrong legal standard. A decision is "manifestly unreasonable" if the court, despite applying the correct legal standard to the supported facts, adopts a view "that no reasonable person would take," and arrives at a decision "outside the range of acceptable choices."
State v. Rohrich, 149 Wash.2d 647, 654, 71 P.3d 638 (2003) (citations omitted).
¶ 22 Ruling Precluding Impeachment Testimony of Victim's Counselor. Dixon claims that the trial court erred in refusing to allow the defense to call Peggy Zorn, N.D.'s counselor, as an impeachment witness. ER 613 governs the admissibility of impeachment evidence. The rule provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." ER 613(b) (emphasis added). As the comment to ER 613(b) explains, under Washington law "if the witness responds to foundation questions by admitting making the prior inconsistent statement, then extrinsic evidence of the statement is inadmissible." Where a witness admits to the statement at issue, a trial court may reasonably determine that permitting extrinsic evidence would be a "waste of time" or a "needless presentation of cumulative evidence." ER 403.
¶ 23 In the present case, consistent with the requirements of ER 613(b), defense counsel afforded N.D. the opportunity to explain the particular statement that the defense intended to introduce through Zorn's testimony. In response to defense counsel's foundation questions, N.D. admitted that she had indeed said to Zorn, "I don't know if it happened or if it was a dream." 3 RP at 311-12. In light of N.D.'s admission that she had made the statement, the trial court reasonably decided that Zorn's testimony could not be deemed evidence of a prior inconsistent statement. The trial court's ruling was not an abuse of discretion.
*997 ¶ 24 Ruling Prohibiting Cross-Examination of Victim Regarding Statements to Hansen. Dixon contends that the trial court erred in refusing to permit cross-examination of N.D. regarding her December 2001 comments to Hansen. This issue differs from the first issue in a key respect. Because N.D.'s statement to Zorn indisputably pertained to the molestation allegations, the trial court permitted defense counsel to proceed pursuant to ER 613(b) and ask N.D. if she had in fact told Zorn that she was unsure whether the acts of molestation had happened or were a dream. Here, however, because the defense was unable in the first instance to assure the trial court that N.D.'s remarks to Hansen concerned the molestation charges, the trial court gave the defense an opportunity to make an offer of proof to establish that, when N.D. spoke to Hansen, they "were talking about the sexual touching that was alleged to have occurred, and that's when [N.D.] brought up the statement about whether she was lying or not." Id. at 309; see State v. Ray, 116 Wash.2d 531, 538, 806 P.2d 1220 (1991) (stating that one purpose of an offer of proof is to "inform[] the judge of the specific nature of the offered evidence so that the court can assess its admissibility" (emphasis added)). Following Hansen's testimony, the trial court concluded that she had failed to confirm that N.D.'s question about lying concerned the molestation allegations:
We have the surmise, the inference, the conclusion made by this witness that that's what was in [N.D.]'s mind. But we can't allow one witness to speculate on what the other witness is thinking.

4 RP at 506-07 (emphasis added). The trial court thus ruled that N.D. would not be subject to cross-examination regarding her remarks to Hansen.
¶ 25 Dixon contends that the trial court's ruling was contrary to ER 104(b). ER 104(a) provides that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court, subject to the provisions of section (b)." ER 104(b) states that, "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition. The comment to ER 104(b) offers some helpful explanation:
This section . . . defines a procedure for handling the situation in which a party wishes to prove fact A, but fact A is relevant only if fact B is established. The order of proof under this rule, as generally, is determined by the judge. Rule 611. The court, in its discretion, may decide whether to hear evidence of fact A or B first, taking into account the relative prejudice of having the jury hear one rather than the other if the proponent fails to offer evidence of one of them sufficient to warrant a finding of its truth. Because of this danger of prejudice, the rule should be used with caution, especially in criminal cases.
(Emphasis added.)
¶ 26 Here, the relevancy of the defense's proffered impeachment evidence (Hansen's testimony concerning N.D.'s alleged question about lying) was dependent upon the establishment of fact B (that N.D. was referring to lies she had told about the molestation allegations). In other words, under ER 104(b), the defense's desire to prove fact A (that N.D. was asking Hansen what she should do if she had lied about the molestation allegations) was dependent on proof of fact B (that N.D.'s question pertained to the molestation allegations). Consistent with the comment to ER 104(b), the trial court exercised its discretion and determined that evidence of fact B should precede evidence of fact A.
¶ 27 Regarding fact B, the trial court's proper inquiry under ER 104(b) is "whether the evidence is sufficient to support a finding of the needed fact." State v. Karpenski, 94 Wash.App. 80, 102, 971 P.2d 553 (1999) (emphasis added). As to the applicable standard of review, the Karpenski court stated that "[w]hen a trial judge's function is to decide whether the evidence is sufficient to support a finding, a reviewing court's function will be the same." Id. at 104, 971 P.2d 553. We conclude, as did the trial court, that the defense provided no "evidence . . . sufficient to support . . . the needed fact." Id. at 102, 971 P.2d 553. Hansen's testimony proved nothing more than that N.D. had possibly *998 lied about something. Hansen's speculation remained the only support for "the needed fact" that N.D.'s comments to Hansen pertained to the molestation allegations. Id. Given the failure of the defense to provide sufficient support, the trial court determined that Hansen's testimony was too speculative and therefore not relevant under ER 104(b) and ER 402. Contrary to Dixon's contention, the trial court's relevancy determination under ER 104(b) was not an abuse of discretion. Because the defense failed to establish the relevancy of N.D.'s cryptic remark to Hansen, the trial court properly precluded the defense from using Hansen's testimony for impeachment purposes as a prior inconsistent statement pursuant to ER 613(b).
¶ 28 We also note that, even if the trial court erred in excluding Hansen's testimony or in precluding cross-examination of N.D. on her conversation with Hansen, any error was harmless. Here, "the untainted evidence is so overwhelming it necessarily leads to a finding of guilt" beyond a reasonable doubt. State v. Easter, 130 Wash.2d 228, 242, 922 P.2d 1285 (1996); State v. Guloy, 104 Wash.2d 412, 426, 705 P.2d 1182 (1985). Given N.D.'s graphic statements to her mother and to Detective Adams, along with the corroborative DNA evidence on the couch cushion,[2] we conclude that, even in the absence of the alleged error, "any reasonable jury would reach the same result" that the jury reached in this case. Easter, 130 Wash.2d at 242, 922 P.2d 1285.

CONCLUSION
¶ 29 We find no abuse of discretion in the trial court's challenged rulings. The defense was permitted to cross-examine N.D. regarding Zorn's potential testimony. N.D.'s statement that she had in fact made the "dream" comment to Zorn rendered Zorn's testimony cumulative under ER 403. The trial court also reasonably precluded the defense from calling Hansen as an impeachment witness, since the connection between N.D.'s remarks and her molestation allegations remained a matter of speculation. We affirm the decision of the Court of Appeals upholding the jury's verdict.
WE CONCUR: CHARLES W. JOHNSON, MARY E. FAIRHURST, JAMES M. JOHNSON, and BOBBE J. BRIDGE, Justices.
MADSEN, J. (concurring).
¶ 30 I agree with the dissent in State v. Dixon, noted at 118 Wash.App. 1005, 2003 WL 21916401 at *6, 2003 Wash.App. LEXIS, at *16 (unpublished opinion) (Bridgewater, J., dissenting), wherein Judge Bridgewater noted that the question presented to the trial court was one of conditional relevance. As he correctly concluded, the trial court erred when it failed to evaluate the evidence in the light most favorable to the defendant, as proponent of the evidence. State v. Karpenski, 94 Wash.App. 80, 103 n. 101, 971 P.2d 553 (1999) (judge may not reject inferences favorable to the proponent when determining sufficiency of evidence under ER 104). As Judge Bridgewater stated, N.D.'s statements to Amber Hansen about lying were relevant if the jury believed those statements concerned Dixon.
¶ 31 The evidence offered by Arthur Dixon showed that just prior to N.D.'s unsolicited statement to her aunt about lying, N.D. had overheard her mother and Hansen talking about Dixon and the charges that were filed as a result of N.D.'s accusations against Dixon. And, during the same time period, N.D. had discussed with her counselor whether the abuse she complained of was real or a dream. Viewed in the light most favorable to Dixon, the statements are at least minimally relevant as prior inconsistent statements. This is so because N.D. had testified that the abuse occurred, but these prior statements, and the inferences therefrom, imply that she was lying about the abuse. State v. Dickenson, 48 Wash.App. 457, 467, *999 740 P.2d 312 (1987) (inconsistency is determined not by specific statements alone but by the effect or impression conveyed). For the reasons articulated by Justice Sanders in his dissent, Dixon should have been allowed to pursue this area of inquiry. The State could then have attempted to demonstrate that the earlier statement was not made or that it did not refer to Dixon.
¶ 32 Although I would hold that the trial court erred in refusing to allow Dixon, a criminal defendant, to impeach the complaining witness, I also agree with the majority that the error was harmless. Judge Bridgewater and Justice Sanders contend that, because the entire trial turned on N.D.'s credibility, the error cannot be harmless. However, N.D. admitted before the jury that she had talked to her counselor about whether the abuse had occurred or whether she had imagined it. Further, the jury was aware that N.D. had recanted her statement to her mother regarding inappropriate touching, though she continued to assert that her father had behaved in a sexually inappropriate manner (which Dixon also admitted to his wife). Considering the other evidence presented, which is thoroughly discussed by the majority, and the minimal relevance of the statements at issue, I do not believe the jury would have reached a different conclusion even if it had heard about N.D.'s conversation with her aunt.
¶ 33 I concur in the result reached by the majority.
SANDERS, J. (dissenting).
¶ 34 The majority holds Arthur Dixon failed to provide evidence "`sufficient to support'" the fact that N.D. had been discussing Dixon's molestation charges when she asked her aunt, Amber Hansen, "[W]hat do I do if I'm lying[?]" Majority at 997 (quoting State v. Karpenski, 94 Wash.App. 80, 102, 971 P.2d 553 (1999)); 4 Report of Proceedings (RP) at 489. Accordingly, the majority upheld the trial court's determination that Hansen's testimony was "too speculative and therefore not relevant" under ER 104(b). Majority at 997-98. I disagree.
¶ 35 Hansen's testimony is not irrelevant because viewed in a light most favorable to Dixon it is entirely plausible for the jury to infer N.D.'s statement "[W]hat do I do if I'm lying[?]" referenced Dixon's alleged molestation. And when considering preliminary questions related to relevance, the trial court may not reject evidence or inferences favorable to the proponent. Karpenski, 94 Wash. App. at 103 n. 101, 971 P.2d 553.
¶ 36 Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401 (emphasis added). The threshold for relevancy is low. Bell v. State, 147 Wash.2d 166, 182, 52 P.3d 503 (2002). "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." ER 104(b).[1] In other words "`[t]he judge requires the proponent to bring forward evidence from which the jury could find the existence of the preliminary fact. The opposing party may *1000 then bring in disputing evidence. If on all the evidence the judge determines that the jury could not find the existence of the preliminary fact, he excludes the evidence. Otherwise, the question is for the jury.'" Kosmas v. State, 316 Md. 587, 601, 560 A.2d 1137 (1989) (quoting McCormick on Evidence § 53, at 137) (Edward W. Cleary ed., 3d ed. (1984)). See also Kosmas, 316 Md. at 601, 560 A.2d 1137 ("`The judge must determine that a reasonable jury could make the requisite factual determination based on the evidence before it.'" (quoting 1 Jack B. Weinstein and Margaret A. Berger, Weinstein's Evidence § 104[09] (1988))).
¶ 37 N.D.'s aunt who witnessed the question believed N.D. was discussing her father. It is therefore plausible a jury could reach the same conclusion.
Q: (Defense counsel) And what was [N.D.] talking about?
A: (Hansen) She was talking about her dad or at least that's what I got out of it.
Q: Had you been talking about her father?
A: Yes.
4 RP at 489.
¶ 38 Judge Bridgewater's dissent from the Court of Appeals decision below correctly determines a reasonable jury could reach such a conclusion after inferring from N.D.'s statement,
"1. A lie had been told.
"2. By [N.D.] (she was asking about herself, and not asking for another).
"3. The lie related to whether the molestation occurred, not to lies about breaking things."
State v. Dixon, noted at 118 Wash.App. 1005, 2003 WL 21916401 at *6, 2003 Wash.App. LEXIS 1770, at *17 (2003) (unpublished opinion) (Bridgewater, J., dissenting). N.D.'s use of the first person suggests she was talking about herself as having told the lie. Her comment, "phrased in the past tense, that it had `gone too far' suggests both that N.D. was talking about an actual, past lie and that the lie was about a serious matter capable of `go[ing] too far.'" Id. at *6, 2003 Wash.App. LEXIS 1770 at *17 (alteration in original) (quoting 4 RP at 489). Furthermore, N.D. posed the question shortly after Hansen and N.D.'s mother discussed Dixon in N.D.'s presence. 4 RP at 489. In a light most favorable to Dixon, this evidence and resulting inferences reasonably connect N.D.'s lie to Dixon's alleged molestation. Id. at *6-7, 2003 Wash.App. LEXIS 1770 at *17-18.
¶ 39 In support of its position, the majority states "the trial court concluded that [Hansen] had failed to confirm that N.D.'s question about lying concerned the molestation allegations." Majority at 997. But the trial court's analysis was incorrect; Hansen did not need to confirm N.D's question about lying concerned the molestation allegations; the court needed merely to find "evidence sufficient to support a finding of the fulfillment of the condition." ER 104(b) (emphasis added).[2] And here, the evidence was sufficient to support such a finding.[3]
¶ 40 Even after "conditionally relevant" evidence is admitted, a jury must weigh its value and probative force to determine the *1001 ultimate question: whether Dixon molested N.D. See State v. Reil, 409 N.W.2d 99, 106 (N.D.1987) ("Once the evidence is admitted the question becomes one of credibility and probative force and the trier may ultimately disbelieve the proponent's proof and entirely disregard or substantially discount the persuasive impact of the evidence admitted. [ER 104(b)] requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification. The rest is up to the jury.'" (quoting 1 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 901(a) [01], at 901-16 to -18 (1983))). In the end, the jury may find the evidence so overwhelmingly indicative of abuse that N.D.'s question could not have been referencing the molestation charges. But this is a question for the jury and not for the courts.
¶ 41 Dixon was precluded from using Hansen's testimony for impeachment purposes under ER 613(b). Criminal defendants have a constitutional right to impeach prosecution witnesses with prior statements that are inconsistent with the witness's trial testimony. See State v. Dickenson, 48 Wash.App. 457, 470, 740 P.2d 312 (1987) (constitutional harmless error test applies to the erroneous refusal to allow a defendant to impeach a witness with a prior inconsistent statement). And reversal is required unless no rational jury could have a reasonable doubt about the defendant's guilt absent the error. State v. Spencer, 111 Wash.App. 401, 408, 45 P.3d 209 (2002). Contrary to the majority's determination that "`the untainted evidence is so overwhelming it necessarily leads to a finding of guilt' beyond a reasonable doubt," the court's error is not harmless as the entire case rests upon N.D.'s credibility, and evidence "poking holes" in her credibility would doubtless affect the outcome of the trial. Majority at 998 (quoting State v. Easter, 130 Wash.2d 228, 242, 922 P.2d 1285 (1996)). See State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001) ("An error is prejudicial if, `within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' State v. Smith, 106 Wash.2d 772, 780, 725 P.2d 951 (1986). Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole.").
¶ 42 The case should be reversed and remanded for a new trial.
¶ 43 Accordingly I dissent.
WE CONCUR: Chief Justice GERRY L. ALEXANDER and Justice TOM CHAMBERS.
NOTES
[1] The sentence was based on his 1992 conviction for rape of a child in the first degree. Clerk's Papers (CP) at 9, 14, 18; see RCW 9.94A.030(33)(b)(i)(A). "The Rape of a Child, 1st Degree conviction resulted from Dixon committing a sexual assault [on April 7, 1992] against his [then] six-year-old sister-in-law[, victim N.D.'s aunt, Amber Hansen]. Dixon victimized his sister-in-law by rubbing his penis against her vaginal area and demanded that she fellate him, which she did. Dixon committed sexual assaults consisting of these behaviors on four to five occasions." "Pre-Sentence Investigation Report," CP at 9-10, 14. Dixon was released from prison in 1998 and thereafter participated in a sexual deviancy counseling program until October 2000. Id. at 11. Amber Hansen spoke at Dixon's sentencing in the present case, expressing her hope that he would "stay[] in jail where he can't hurt another person again." 5 Report of Proceedings (RP) at 566.
[2] "Dixon's explanation for the presence of his semen on the couch was that he had masturbated there, but he claimed that he had never masturbated in N.D.'s presence or while she was at home. The pivotal question thus becomes how an eight-year-old girl could know that her father had ejaculated on the couch if he never masturbated in her presence, and the dried semen was no longer visible, unless he had molested her there and she had witnessed him ejaculating, just as she testified." Dixon, at *6, n. 4, 2003 Wash. App. LEXIS 1770, at *15 n. 4.
[1] The principle of conditional relevance poses some evidentiary difficulties. Dale A. Nance, Conditional Relevance Reinterpreted, 70 B.U. L.Rev. 447 (1990). Nance sets forth the "notice hypothetical" to illustrate such difficulties:

"[W]hen a spoken statement is relied upon to prove notice to X, it is without probative value unless X heard it." Id. at 450 (alteration in original).
Nance argues the "[trier of fact] must evaluate the likelihood that [the statement] was heard, but even if, from all the evidence presented, there is only a small probability that X heard the spoken statement, it is still some evidence of notice that, together with the other evidence, may warrant a finding of notice." Id. at 450 (second emphasis added). Moreover, argues Nance, "[i]f notice is merely an evidentiary proposition, rather than an ultimate proposition in the case, then the ultimate proposition toward which evidence of notice is directed may be found to be true notwithstanding insufficient evidence to warrant a finding of notice. In such a case, the evidence of notice must be considered together with other evidence that pertains to the ultimate proposition." Id. at 451.
Nance's point is simply "the trier of fact must make a finding, by the appropriate standard of proof, only as to the ultimate propositions in the case, not as to intermediate evidentiary propositions contained within inferential chains." Id.
[2] The majority states, "the trial court's proper inquiry under ER 104(b) is "`whether the evidence is sufficient to support a finding of the needed fact.'" Majority at 997 (quoting Karpenski, 94 Wash.App. at 102, 971 P.2d 553). Emphasis is more appropriately placed as follows: "the trial court's proper inquiry . . . is . . . `whether the evidence is sufficient to support a finding of the needed fact.'" That is, could a reasonable jury conclude, from the evidence before them N.D.'s question referred to Dixon's molestation charges.
[3] The trial court stated, "We have the surmise, the inference, the conclusion made by this witness that that's what was in [N.D.'s] mind. But we can't allow one witness to speculate on what the other witness is thinking." 4 RP at 506-07. Ironically, the same court confidently determined a jury could not have concluded N.D.'s question pertained to her father's molestation charges. See State v. Robinson, 24 Wash.2d 909, 917, 167 P.2d 986 (1946) ("It is highly improper for courts, trial or appellate, to speculate upon what evidence appealed to a jury. Jurors and courts are made up of human beings, whose condition of mind cannot be ascertained by other human beings. Therefore, it is impossible for courts to contemplate the probabilities any evidence may have upon the minds of the jurors.").