

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39032-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| LANCE ROBERT BOWERS, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — A jury found that Lance Bowers shot his wife, Angela, to death. Bowers appeals his convictions for first degree murder, first degree reckless burning, first degree unlawful possession of a firearm, and two counts of first degree assault on a law enforcement officer. Bowers seeks a new trial on all convictions on the basis of evidentiary error, instructional error, and prosecutorial misconduct. He also challenges the sufficiency of evidence for the first degree murder conviction. We affirm the convictions, but remand for the erasure of a victim penalty assessment.

FACTS

The prosecution encompasses the killing of Angela Bowers allegedly by her husband, Lance Bowers, on June 2, 2019, and a confrontation between sheriff deputies and Bowers thereafter, during which Bowers pointed a gun at the deputies. Five persons named in the facts bear the surname "Bowers," the accused Lance Bowers, Lance's brother Joe, Lance's wife and murder victim Angela, and Lance's and Angela's two sons, Darren and Jaden. When using the surname "Bowers" without a first name, we refer only to Lance. We garner a majority of the facts from trial testimony.

We begin with select events in the month preceding Angela Bowers' death by bullets. During May and early June 2019, Lance and Angela Bowers occasionally stayed with Lance's mother and stepfather, Sharon and Roger Alumbaugh. On Friday, May 31, the Alumbaughs left their Okanogan County residence for a weekend visit to the Tri-Cities. Before leaving, the Alumbaughs directed Lance and Angela not to allow Lance's brother, Joe Bowers, to visit the residence. The Alumbaughs had procured court orders that barred Joe from entering their property. The Alumbaughs also told Angela and Lance they would return on Sunday, June 2.

On June 1, 2019, neighbors to the Alumbaughs saw and overheard Lance and Angela Bowers arguing in front of the Alumbaugh residence. On the afternoon of June 2, Bowers told an acquaintance that Angela was "probably off fucking Joe." Report of Proceedings (RP) at 2168.

2

The Alumbaugh residence maintained a security system that recorded activities using eight cameras spaced throughout the abode. At trial, the State played videos recorded by the system that showed Lance and Joe Bowers moving throughout the house and Angela Bowers present inside the home on June 2. Nevertheless, neither party sent this court the videos. During argument to the jury, the State's attorney commented that, at 5:10 p.m. on June 2, a video showed the presence of a living Angela. The same video, according to the State, revealed the brothers, at 5:20, entering the home with Lance placing his hand in his front right pocket and Joe carrying a bag. At 5:59, someone discontinued the recording system.

Sharon and Roger Alumbaugh returned to Okanogan County at 8:00 p.m. on Sunday, June 2, 2019. Lance Bowers' blue Mitsubishi Eclipse was parked on their property but not in an area where cars usually parked. Roger observed nothing being displayed on the television used to monitor the house's eight-camera security system.

Upon returning home, both Sharon and Roger Alumbaugh discovered the house to be "trashed." RP at 2019. Lance Bowers was cleaning the floor and back wall in the laundry room with bleach. He had washed bags of laundry, which included his and Angela Bowers' bedding. According to Roger, Bowers then acted under the influence of drugs, as shown by Bowers' sluggish responses and speech and unusual reactions in his pupils.

3

Angela Bowers was not present when the Alumbaughs returned to their Okanogan County residence. Roger asked Lance Bowers why Angela was gone. Bowers replied that Angela had probably permanently left him.

During the morning of Monday, June 3, 2019, individuals living near Frosty Creek Road, a rural path in Okanogan County, saw Lance Bowers on the side of the road working on a disabled blue Mitsubishi Eclipse. Of those individuals who saw him, Melvin Hall, Jay Kuntz, and Joseph Gould stopped to ask if Bowers needed help. Bowers denied Hall and Kuntz's offer but let Gould tow the car up the road.

Kelly Skaggs, a neighbor of Melvin Hall, also beheld the blue Mitsubishi Eclipse that morning. Skaggs stopped his vehicle to take pictures of the unoccupied car because "[something] didn't feel right to [him]." RP at 1095. He observed no one in the area. As Skaggs photographed the Eclipse, he saw trash inside the vehicle.

During mid-afternoon on June 3, Kelly Skaggs noticed that the blue Mitsubishi Eclipse had been redeployed to a different location on the side of the road closer to Melvin Hall's residence. Skaggs saw Lance Bowers standing in front of the vehicle. Skaggs stopped his vehicle next to Bowers' Eclipse and saw inside Bowers' vehicle. When he peered into the Mitsubishi Eclipse this second time, the inside looked different. Skaggs now saw "a bunch of material piled up" and a six-inch flame flaring from paper behind the driver's seat. RP at 1105-08, 1168-69, 1178. When Skaggs asked Bowers how the fire started, Bowers smirked: "it spontaneously combusted." RP at 1109-10.

4

Kelly Skaggs wished to tow the extemporaneously kindled Mitsubishi Eclipse away from brush surrounding it. Skaggs went to Melvin Hall's house to ask for assistance. Skaggs yelled to Hall and Jay Kuntz, who was at Hall's house, about a car fire. Hall called 911, Kuntz drove his car to the fire, and Skaggs arrived in his car soon after.

The Mitsubishi Eclipse fire had sprouted by the time Kelly Skaggs and Jay Kuntz arrived at the car. The pair towed the car out of the ditch to prevent the fire from creating a burning bush. Lance Bowers rejected Skaggs' entreaty to assist. Bowers alternatively paced and stood in a "stoic" manner as the car burned. RP at 1170.

Soon Melvin Hall arrived on his ATV. When Lance Bowers saw Hall coming, he walked away from the fire. As the fire continued, Kelly Skaggs, Jay Kuntz, and Hall heard multiple poppings and bantam explosions wafting from the Eclipse. The three assumed the blaze had ignited ammunition present in the car. Hall, on his ATV and from a distance, thereafter followed Bowers for two miles and stopped when Bowers traveled into a wooded area unfamiliar to Hall. Hall awaited the arrival of law officials to assist in Bowers' apprehension.

At 4:30 p.m. on June 3, volunteer firefighter Thomas Hoffman arrived at the situs of the Mitsubishi Eclipse fire. On his way to the fire, Hoffman saw Lance Bowers walking in the middle of the road and Melvin Hall following him on an ATV. When Hoffman reached the fire, he observed the car engulfed in flames and heard explosions

5

emanating from the Eclipse.  Efforts to extinguish the fire commenced when a firetruck arrived fifteen minutes later.  Firefighters extinguished the fire in the passenger compartment of the car before moving to the trunk.  As firefighter Hoffman opened the trunk, he observed a human body.  Firefighters discontinued the spray of water, closed the Mitsubishi trunk, and contacted law enforcement to report their discovery.

Okanogan County Sherriff Patrol Sergeant Terry Shrable responded to the car fire.  By the time Sergeant Shrable reached the fire, the flames had completely consumed the Eclipse.  When firefighters opened the trunk of the vehicle for Sergeant Shrable, Shrable saw human remains.

Okanogan County Sheriff Deputies Tait Everett and Isaiah Holloway appeared at the scene after Sergeant Terry Shrable's arrival.  Deputy Everett espied human remains in a tote bag inside the trunk.  Holloway took pictures of the vehicle, and Shrable photographed the human remains.  Shrable then researched the front license plate number of the Mitsubishi Eclipse, and he learned that Lance Bowers owned the car.  Shrable stayed with the vehicle while Holloway and Everett searched for Bowers.

As Douglas Isler, owner of the nearby Aeneas Valley Country Store, closed the store on June 3, an off-duty store employee called Isler and told him the Sheriff's Office was looking for a man with a shaved head.  The employee advised Isler to call 911 if he saw someone matching that description.  After the phone call, Isler left the store.  As Isler drove around the back corner of the store to the front of the property, he saw an

individual who matched the description given walking toward the building. Isler stopped to call 911. During Isler's conversation with dispatch, Bowers walked in the direction of Isler's car. Bowers strolled past the vehicle without talking to Isler and continued along the road. Isler watched Bowers from a distance and, within a few minutes, Deputy Isaiah Holloway and Sergeant Tait Everett appeared. Isler pointed the officers in Bowers' direction.

Deputies Tait Everett and Isaiah Holloway, who respectively operated fully marked police cars with lights activated, parked twenty yards behind Lance Bowers. Both Everett and Holloway drew firearms as they exited their cars. The two law enforcement officers believed Bowers may be armed, particularly because of the detonating ammunition in the Mitsubishi fire. Bowers stood sideways with his left side facing the officers. Because Bowers stuck his hands in his pockets, the officers repeatedly yelled at him to show his hands. Bowers did not comply, so Sergeant Everett retrieved K-9 Havoc from his vehicle. The officers continued to shout at Bowers to show his hands. Everett yelled that that the dog would bite Bowers if he did not show his hands. Bowers took his left hand out of his pocket and pointed at the sky. Nothing was in his hand.

Because Lance Bowers refused to remove his right hand from his pocket, Sergeant Tait Everett sicced Havoc on him. Before Havoc reached Bowers, Bowers lowered his left hand and used his right hand to pull a revolver out of his right pocket. Both officers

7

shot at Bowers. Bowers dropped his firearm. Sergeant Everett returned Havoc to the patrol vehicle, while Deputy Holloway treated Bowers' bullet wounds. Officers recovered the gun Bowers dropped.

Two days after the incident, Deputy Isaiah Holloway wrote in an incident report:

> Lance looked at us and took his left hand out of his left front pocket and pointed to the sky. I heard Lance say God while pointing to the sky. I then observed Lance moving his right arm and drawing a revolver from his right front pocket. I could see K9 Havoc running towards Lance. Lance began to raise the firearm. At that time I felt Lance was an imminent threat to kill or seriously injure myself or Sgt. Everett. I began to aim my firearm at Lance and could see the revolver moving above K9 Havoc's head. The revolver was above Lance's waist at that time. I discharged my firearm until I observed Lance drop the revolver on the shoulder of the roadway and he then fell into the ditch.

Clerk's Papers (CP) at 277.

Days later, Sharon Alumbaugh discovered her gun missing from her residence. Both Roger and Sharon Alumbaugh noticed a roll of electrical tape and a one-gallon can of chainsaw fuel missing from the dwelling.

DNA testing on the body found in the trunk of Lance Bowers' Mitsubishi Eclipse matched that of Angela Bowers. An autopsy of Angela's body established that she had been shot once in the neck and once in the head. Forensic examination of the two bullets recovered from her body showed that they had been fired by the gun Bowers dropped after being shot, the same gun Sharon Alumbaugh reported missing from her home.

8

On June 11, 2019, after being incarcerated, Lance Bowers spoke on the phone with his son, Darren Bowers, from jail. The jail recorded the call, which proceeded as follows:

> LANCE BOWERS: There's—but there's zero dollars; there's zero dollars on my account, so that's why I made the call and then I tried to call collect and it wouldn't let it (indiscernible). And I never got a hold of your mom.
> DARREN BOWERS: Well, mom's dead.
> LANCE BOWERS: Dead?
> DARREN BOWERS: Yeah.
> LANCE BOWERS: He just said—
> DARREN BOWERS: Mom was found in the back of your trunk, burnt and shot. That's what happened.
> LANCE BOWERS: What happened?
> DARREN BOWERS: I mean, I don't know any other reason (indiscernible) you were arrested in Aeneas Valley. You had a gun. It was all over the news all over the place.
> LANCE BOWERS: It's on the news?
> DARREN BOWERS: It was on the news. You might have blacked out because what's going on? Sorry about the whole—
> LANCE BOWERS: I'm going to go. I'm going to let you go.

RP at 2386-87 (alterations in original).

## PROCEDURE

The State of Washington charged Lance Bowers with first degree murder, theft of a firearm, first degree reckless burning, first degree unlawful possession of a firearm, possessing a stolen firearm, two counts of first degree assault, and witness tampering. The State alleged that Bowers acted as the principal or as an accomplice of his brother

9

Joseph Bowers in murdering Angela Bowers. The assault charges arose from Bowers'

aiming of the gun at the two sheriff deputies.

On appeal, Lance Bowers maintains that the prosecuting attorney

unconstitutionally commented on his silence once during opening statement and four

times during closing statement. During opening statement, the State's attorney

commented:

> He's [Lance Bowers is] in jail and he's giving a conversation with
> one of his sons, Darren Bowers. And in that conversation that took place
> on June 16th [11th] of 2019, the Defendant never denied killing his wife to
> his son, Darren. We believe that you will have the opportunity to listen to
> that recording.
> . . . .
> Not once did he [Lance Bowers] deny that he killed his wife when
> confronted with that information [by his son, Darren]. That's corroborating
> information that we know from the investigation in this case.

RP at 1029-30 (alterations added).

During trial, the jury watched video surveillance footage captured by the security

system in the Alumbaughs' home around the time of Angela Bowers' murder and viewed

screenshots taken of those videos. During its closing argument, the State presented a

PowerPoint slideshow that included pictures, both marked as exhibits and not marked as

exhibits, and video footage from the Alumbaughs' surveillance system. The record sent

to this court includes the slideshow but excludes the video exhibits played for the jury.

The marked exhibits forwarded to this court via the clerk's papers do not include the

10

video surveillance footage captured by the Alumbaughs' security cameras or screenshots taken from those videos.

During trial, Lance Bowers wished to impeach Deputy Isaiah Holloway's credibility by introducing evidence of an employment disciplinary action regarding Holloway's extramarital affair with a "practicing criminal," which disciplinary action and affair both occurred after the shooting. CP at 334. Holloway reported, during an internal investigation of the affair:

> Since my father past [sic] 3 years ago I have been in declining mental health. Since the shooting last year, I have fell off of a cliff into depression, anxiety and PTSD. I have tried to cover it all up for this "tough guy" cop job I thought we had to be. Instead of seeking help I fell into a world of porn addiction, sexting and now an affair. I need help and I'm not sure where to turn to.

CP at 337 (alterations added).

Lance Bowers argued that Isaiah Holloway's extramarital affair and the discipline that followed proved relevant because Holloway claimed depression from his encounter with Bowers led to the extramarital tryst. Bowers maintained that Holloway became depressed not because of the shooting but because he misleadingly reported the shooting. In response, the State argued no connection existed between Deputy Holloway's depression and the alleged dishonest statements he made during the course of the investigation into the shooting. The trial court ruled:

THE COURT: . . .  I think there could be some inquiry that he is disciplined as a result of this down the line, him suffering from depression and engaging in conduct that was unbecoming an officer.

So to that extent, I think it allows the impeachment, without—I don't see any—I'm just still not seeing how the Defense can tie it in that he made false statements at this point.  And so—other than the fact that you just point out his report may be different than the officers that have testified and that type of thing.  And you can ask him those type of questions.

RP at 1725-26.

During trial, Deputy Isaiah Holloway testified that Lance Bowers was not complying with his and Deputy Tait Everett's commands to show them his hands.  As they continued yelling commands at Bowers, Everett retrieved K-9 Havoc from his vehicle.  After Everett warned Bowers about the dog, Bowers removed his left hand from his pocket and pointed at the air.  Bowers lowered his left hand while simultaneously using his right hand to pull a revolver out of his right front pocket.  Holloway averred:

At that point, the gun is coming out, Havoc starts running towards him, and then when Havoc is getting to him, the gun goes over Havoc's head and it's pointed towards what I believe is Sergeant Everett first because that's just the natural way when you come around.  So at that point I fear that he's going to try to kill Sergeant Everett and myself at that point.

RP at 1784.

Deputy Isaiah Holloway continued his testimony by declaring Havoc ran straight to Lance Bowers.  Havoc struck Bowers on the latter's right lower torso and waist.  According to Holloway, Bowers pointed the gun "at a height that could—that could seriously injure or harm or kill us [himself and Everett] to then pointed towards the gun,

when—as he dropped it," and Lance held the gun above Havoc's "head, pointing towards

Sergeant Everett." RP at 1786-87, at 1810. In response to the prosecutor questioning

Holloway about how the incident impacted him, Holloway answered "Quite a bit." RP at

1799.

During trial, the State played the jail's recording of the phone call between Lance

Bowers and his son Daren Bowers on June 11, 2019. At the conclusion of the evidence,

the trial court dismissed the charges of theft of a firearm, possession of a stolen firearm,

and tampering with a witness.

Lance Bowers complained about the State's proposed jury instruction that

included references to accomplice liability, but he did not formally object to the

instruction. He claimed that insufficient evidence supported this alternative theory of

criminal guilt. The trial court responded that Bowers' disposal of the corpse after the

shooting presented circumstantial evidence that Bowers participated in the killing,

assuming Joe Bowers was the shooter.

The trial court delivered the following instructions to the jury:

Instruction 9

A person is guilty of a crime if it is committed by the conduct of
another person for which he or she is legally accountable.
A person is legally accountable for the conduct of another person
when he or she is an accomplice of such other person in the commission of
a crime.
A person is an accomplice in the commission of a crime if, with
knowledge that it will promote or facilitate the commission of the crime, he

13

or she either: 1) solicits, commands, encourages, or requests another person to commit the crime; or 2) aids or agrees to aid another person in planning or committing the crime.

The word aid means all assistance, whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of a crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime, whether present at the scene or not.

## Instruction 10

A person or an accomplice commits the crime of Murder in the 1st Degree when with a premeditated intent to cause the death of another person, he or she or an accomplice causes the death of such person or of a third person.

## Instruction 12

To convict the Defendant of the crime of Murder in the 1st Degree as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt: 1) That on or between June 1, 2019, and June 3, 2019, the Defendant or an accomplice acted with intent to cause the death of Angela Marie Bowers; 2) That the intent to cause the death was premeditated; 3) That Angela Marie Bowers died as a result of the Defendant's or his accomplice's acts; and 4) That any of these acts occurred in the County of Okanogan, in the State of Washington.

## Instruction 26

A person commits the crime of Assault in the 1st Degree when, with intent to inflict great bodily harm, he or she assaults another with a firearm.

## Instruction 27

Great bodily harm means bodily injury that creates a probability of death; or that causes significant serious, permanent disfigurement; or that

causes a significant permanent loss or impairment of the function of any
bodily part or organ.

### Instruction 28

An assault is an intentional touching, striking, cutting, or shooting of
another person that is harmful or offensive, regardless of whether any
physical injury is done to the person.  A touching, striking, cutting, or
shooting is offensive if the touching, striking, cutting, or shooting would
offend an ordinary person who is not unduly sensitive.

An assault is also an act done with intent to inflict bodily injury upon
another—tending, but failing to accomplish it.  And accompanied with the
apparent present ability to inflict the bodily injury if not prevented.  It is not
necessary that bodily injury be inflicted.

An assault is also an act done with the intent to create in another
apprehension and fear of body injury.  And which, in fact, creates in
another a reasonable apprehension and imminent fear of bodily injury, even
though the actor did not actually intend to inflict bodily injury.

### Instruction 29

Bodily injury means physical pain or injury, illness, or impairment
of physical condition.

### Instruction 30

To convict the Defendant of the crime of Assault in the 1st Degree
as charged in Count 6, each of the following elements of the crime must be
proved beyond a reasonable doubt: 1) That on or about June 3rd, 2019, the
Defendant assaulted Isaiah Holloway; 2) That the assault was committed
with a firearm; 3) That the Defendant acted with intent to inflict great
bodily harm; and 4) That this act occurred in the County of Okanogan, in
the State of Washington.

RP at 2786-87, 2788, 2793-95.

During closing, the prosecuting attorney admitted the lack of direct evidence to

determine who shot Angela Bowers, but, according to the State, the death occurred in the

Alumbaugh residence.  The State, at length, reviewed the accomplice liability jury

instruction and explained the nature of accomplice liability to the jury.  The State focused

on the theory that Lance Bowers killed Angela while assisted by brother Joe Bowers,

although the State did not know the extent of Joe's involvement.  The State emphasized

that Bowers possessed the gun that killed Angela when he was arrested.  Bowers packed

the dead body in the trunk of his car.

Also during closing, the defense challenged Deputy Isaiah Holloway's testimony

regarding the shooting:

> Version number two—Isaiah Holloway.  This one, I would assert to you, is utter nonsense.  Isaiah Holloway testified that Lance Bowers gave—they come up on Lance Bowers; they're ordering commands.  He said he put his arm up; he said he heard Lance say something about God; and then Lance—and the dog is somewhere coming; Lance pulls out the gun, turns towards them over—and you probably remember (indiscernible) coming back here on the other end of the jury box trying to get Deputy Holloway to tell me how far approximately Lance was away from him.
>
> Now Deputy Holloway said well, it was about 20 yards.  Well, I'm really curious here, Deputy Holloway—if you knew it was 20 yards from remembering that circumstance, how in the world can you not tell me what approximately how far he was away in here?  The reality is he just simply didn't want to be cooperative.  He was being evasive.
>
> Now let's—let's walk out approximately 20 yards here.  It's not a long step for me—one, two, three, four, five, six, seven, eight, nine, ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty.  Is this the end of the jury box?  It's a little bit past it, right?
>
> So he said approximately—Deputy Holloway testified that the distance him and Sergeant Everett was probably a little closer than what Judge Rawson is to where he was sitting.  So if I'm Lance Bowers, I'm back here.  Deputy Holloway made a big deal about the angle.  Can you

16

really tell which angle we're looking at before you get (indiscernible)? That's a very, very small angle—not one you could tell.

Now he also—and I tried to be very clear with him in his testimony. I said okay, did—there was no firing until the gun was brought up over top; it was pointing towards Sergeant Everett. Now, if it's pointing towards the—at this point, the body is facing in that direction. Now I'm pretty sure that neither Sergeant Everett nor Deputy Holloway had magic curving bullets because I'm not aware of how you can get shot in the back twice— well, one perpendicular and one on the back when you're facing someone. I'm pretty sure that's not possible.

What does that tell you? Well, for one thing—we know Deputy Holloway was advised and waited a while before writing his report. Why? Probably because he knew he shouldn't have been shooting there and wanted to think about it so he could come up with a legal basis for his shooting. That's a distinct possibility.

What we do know is what he said is not possible—that did not occur. Lance Bowers never raised the gun. Lance Bowers never pointed the gun. And what we absolutely know is Lance Bowers never pulled the trigger.

RP at 2892-94 (alterations in original).

During summation, the defense reminded the jury that the State also asserted Joe Bowers may have killed Angela Bowers and that Lance Bowers was guilty as an accomplice. Defense counsel, like the State's attorney, explained the nature of accomplice liability to the jury. The defense argued:

[W]e know Lance was gone. Multiple people say Lance was gone— multiple people.
Did Angela Bowers die while Lance was gone? It is certainly a possibility. And I would assert to you it actually explains Lance's actions in that moment.
Timeline—again, obviously there's three options here—Lance Bowers murdered Angela Bowers; Lance Bowers was an accomplice; or someone other than Lance killed Angela and Lance was not complicit. Those are our only three options. Option 1, Option 2, and Option 3.

17

RP at 2903-04.

In its rebuttal closing, the State argued that Joe Bowers held no motive to kill Angela Bowers and no evidence showed Joe knew the Alumbaughs would be gone from the home at the time he visited the residence. The State's attorney also delivered remarks that Lance Bowers insists breached his Fifth Amendment right to remain silent.

> Let's talk about the murder. Defense Counsel argues at length that apparently his brother killed Angela. *What evidence did he provide to you? Say something. One thing.* The fact that he was there?

RP at 2919 (emphasis added). Counsel added:

> So I have a series of questions I want to ask you that are rhetorical they're not for you to answer. The first—*why at any point didn't the Defendant call the police*?

RP at 2920 (emphasis added).

> I mean, at some point it got to a point where—I mean, if he's truly covering for his brother, which is ridiculous—at some point *he has to say the gig's up, right?*
> *How many opportunities did he have?* He had the opportunity when his car broke down; the fire department came; the police responded to the scene. He could have stayed there, but he didn't.

RP at 2920-21 (emphasis added).

> The police responded to the store. *He could have told them*—look, okay, I didn't—look, here's the truth, folks; here's the truth. I—I admit I set the car on fire or whatever, but here's what really happened. None of that happened.

RP at 2921 (emphasis added). Finally, the prosecuting attorney argued:

18

> *Why didn't he call the police*? Why didn't he run toward the police?
> Why didn't he place his hands in the air when the police arrived? He
> knows he can't have a firearm. He knew that they'd be looking for him.

RP at 2921 (emphasis added).

> Somehow, if we're to believe this story, [Lance's] brother kills his
> wife. *He doesn't call the police.* Her body ends up in his car. He drives
> around all night with it. Just so happens to end up with the gun that kills
> her—how did he get that? And then he's missing in action for 12 hours on
> June 2nd—he hasn't been (indiscernible). And the only reason he ends up
> getting caught and the car is on fire, is because he has had the worst day in
> the history of worst days, if all that's true. But it's not.

RP at 2922 (emphasis added) (some alterations added).

The jury found Lance Bowers guilty of first degree murder, first degree reckless

burning, first degree unlawful possession of a firearm, and two counts of first degree

assault. The verdict did not require that the jury decide between accomplice and

principal liability with respect to the murder charge.

At sentencing, the trial court found Lance Bowers to be indigent. As part of

Bowers' sentence, the trial court imposed a $500 victim penalty assessment.

LAW AND ANALYSIS

On appeal, Lance Bowers argues that the State presented to the jury the guilt of

Bowers only on the theory of principal liability. Therefore, according to Bowers, the

State may not seek to affirm the conviction on accomplice liability grounds. He, in turn,

contends that insufficient evidence supported his conviction for first degree murder as the

principal. In addition, Bowers assigns error to two jury instructions because, when

juxtaposed with three other instructions, the two instructions confused the jury as to whether it was required to find an intent to inflict "great bodily harm" as an element to first degree assault. Bowers further accuses the prosecution of misconduct by commenting on his silence. Finally, Bowers assigns error to the trial court's prohibition against the defense asking Deputy Isaiah Holloway of an extramarital affair and job discipline because of the affair.

## Judicial Estoppel

Lance Bowers recognizes that the State charged him alternatively with being the principal and the accomplice to Angela Bowers' killing. But Bowers contends that the State abandoned, by the conclusion of trial, the contention that he was an accomplice. According to Bowers, the State submitted the case to the jury solely on the basis that he was the principal. In turn, Bowers contends that, based on the doctrine of judicial estoppel, the State may not seek to affirm the conviction on appeal under an accomplice liability theory.

We view this contention more as a defense than an offense under which Lance Bowers seeks reversal. We assume that Bowers asserts this contention in part to prevent the State from contending, in response to his challenge to the sufficiency of evidence, that the evidence sufficed to convict him as an accomplice. Because we later agree with the State that substantial evidence supported a conviction as the principal, we need not ask if sufficient evidence could have convicted Bowers under accomplice liability.

20

We also surmise that Lance Bowers argues judicial estoppel in the context of any contention by the State that harmless error excuses any violation of his Fifth Amendment rights. We explain why later. Because of this potential thrust by Bowers, we examine the application of judicial estoppel.

The equitable doctrine of judicial estoppel precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position. *Anfinson v. FedEx Ground Package System, Inc.*, 174 Wn.2d 851, 861, 281 P.3d 289 (2012). Judicial estoppel serves two purposes: preservation of respect for judicial proceedings and avoidance of inconsistency, duplicity, and waste of time. *Arkison v. Ethan Allen, Inc.*, 160 Wn.2d 535, 538, 160 P.3d 13 (2007). A court weighs three factors when determining whether to apply judicial estoppel: (1) whether the party's later position is clearly inconsistent with its earlier position, (2) whether acceptance of the later inconsistent position would create the perception that either the first or the second court was misled, and (3) whether the assertion of the inconsistent position would create an unfair advantage for the asserting party or an unfair detriment to the opposing party. *Anfinson v. FedEx Ground Package System, Inc.*, 174 Wn.2d 851, 861 (2012). The question requires a review of the parties' positions over the course of litigation. *Anfinson v. FedEx Ground Package System, Inc.*, 174 Wn.2d 851, 862 (2012).

*Anfinson v. FedEx Ground Package System, Inc.*, 174 Wn.2d 851 (2012) illustrates the application of judicial estoppel. Pickup and delivery drivers for a shipping company

brought action against the company seeking overtime pay. The workers alleged one theory in favor of overtime pay when seeking class action certification. Later, during the liability trial, the workers switched to an alternative theory of liability for overtime pay. The Supreme Court affirmed the superior court's denial of judicial estoppel. The court agreed that the first factor weighed in favor of judicial estoppel, because the workers asserted a position during trial inconsistent with their position during class certification. Nevertheless, the record did not show that the change in theory misled the court or created an unfair advantage for the workers. Instead, the drivers altered their theory as the facts developed at trial and the company refined its legal position. The shipping company enjoyed the opportunity to argue against both theories.

All three factors weigh in favor of rejecting judicial estoppel against the State in Lance Bowers' appeal. The State pled accomplice liability. The State focused throughout trial on principal liability, but never abandoned accomplice liability as an alternative theory. The State drafted and procured a jury instruction on accomplice liability. Bowers raised issues with the accomplice liability instruction on the basis that evidence did not support such a theory. The trial court dismissed Bowers' concern because his conduct after the killing, including disposing of the body and attempting to incinerate the body, constituted circumstantial evidence supporting the theory that Joe Bowers killed Angela Bowers but Lance participated in the planning and execution of the murder. During closing, the State argued that the jury could convict on the ground of

accomplice liability. In turn, Bowers explained the concept of accomplice liability to the jury and argued against the theory.

Although he challenged the giving of accomplice liability jury instructions at trial, Lance Bowers does not assign any error to the delivery of the instructions on appeal. The lack of an assignment establishes that the parties litigated the question and sufficient evidence supported the State's accomplice liability theory.

On appeal, Lance Bowers claims that the jury found him liable as the principal in Angela Bowers' murder. He does not cite any part of the record to support this factual assertion. The verdict forms allowed the jury to base guilt on principal or accomplice liability and did not require the jury to decide one or the other. *See* CP 850-55.

Lance Bowers claims he focused his defense on principal liability. We may agree since the State focused its offense on principal liability. Nevertheless, Bowers always knew accomplice liability to be inserted in the prosecution. Both parties argued accomplice liability before the jury. The court instructed the jury on the possibility of basing guilt on accomplice liability. Bowers does not suggest on appeal what additional evidence he may have presented or how his trial tactics would have changed if the State and he had not focused the evidence on principal liability.

Sufficiency of Evidence

Lance Bowers admits that the State's evidence showed he was present in the home when Angela Bowers was shot. But he highlights that the evidence also demonstrated

23

that his brother Joe Bowers was in the home. He faults the State's evidence as failing to prove that he, not Joe, shot and killed Angela and argues this failure precluded a conviction for first degree murder. In rejoinder, the State outlines a mountain of circumstantial evidence, including Bowers' conduct before and after the killing, pointing to Bowers as the shooter.

We decline to review the standard principles attended to challenges of the sufficiency of evidence, because we resolve this assignment of error on alternate grounds. Lance Bowers failed to provide this court with a sufficient record to review his contention.

RAP 9.6(a) directs a party to an appeal to designate for transmittal to this court clerk's papers and exhibits filed with the superior court. RAP 9.6(b) lists numerous pleadings required to be designated and forwarded to this court, but the rule's list does not include any trial exhibits. Also, RAP 9.6(a) does not expressly demand that the appellant send to this court a record sufficient for this court to resolve any assignment of error. As a matter of reason and practicality, however, the Supreme Court has stated that the appellant must transmit an adequate record. *State v. Drum*, 168 Wn.2d 23, 38 n.3, 225 P.3d 237 (2010). The Supreme Court dismissed Patrick Drum's challenge to the sufficiency of evidence to convict him of burglary because of the absence of an adequate record.

24

Lance Bowers failed to forward most of the photographs taken as screenshots from the security camera videos and admitted as exhibits at trial. He only transmitted those photo exhibits included in the State's closing PowerPoint slideshow. More importantly, we lack the video surveillance footage introduced as exhibits and played to the jury. The video footage provided key evidence as to the guilt or innocence of Bowers. Therefore, we decline to address his sufficiency of evidence assertion.

Jury Instruction 28

Lance Bowers argues that jury instructions 28 and 29 confused the jury and relieved the State of its burden to prove the elements of first degree assault. The assault charges stemmed from Bowers pointing the gun at Deputy Isaiah Holloway and Sergeant Tait Everett. According to Bowers, the two instructions failed to lucidly inform the jury that, in order to convict him of first degree assault, it had to find beyond a reasonable doubt that he intended to inflict *great* bodily harm, not just bodily harm, on the officers. In arguing confusion, Bowers holds jury instructions 26 and 27 under the light next to instructions 28 and 29 and claims the first two instructions could have steered the jury into convicting Bowers of first degree assault for intending to inflict nongreat, minor, or mere bodily harm.

The State replies that, because Lance Bowers failed to object to instructions 28 and 29 before the trial court, this court should refuse to review the assignment of error

25

unless Bowers shows manifest constitutional error. RAP 2.5(a). The State further argues

that the instructions as a whole adequately conveyed the applicable law to the jury.

Instead of assessing manifest constitutional error, we go directly to the question of

whether any error occurred. We separate the two instructions for purposes of our

analysis and begin with jury instruction 28. To repeat, instruction 28 charged the jury:

> An assault is an intentional touching, striking, cutting, or shooting of another person that is harmful or offensive, regardless of whether any physical injury is done to the person. A touching, striking, cutting, or shooting is offensive if the touching, striking, cutting, or shooting would offend an ordinary person who is not unduly sensitive.
> An assault is also an act done with intent to inflict bodily injury upon another—tending, but failing to accomplish it. And accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
> An assault is also an act done with the intent to create in another apprehension and fear of body injury. And which, in fact, creates in another a reasonable apprehension and imminent fear of bodily injury, even though the actor did not actually intend to inflict bodily injury.

RP at 2793-94.

Jury instruction 26 read:

> A person commits the crime of Assault in the 1st Degree when, with intent to inflict great bodily harm, he or she assaults another with a firearm.

RP at 2793. Instruction 27 declared:

> Great bodily harm means bodily injury that creates a probability of death; or that causes significant serious, permanent disfigurement; or that causes a significant permanent loss or impairment of the function of any bodily part or organ.

26

RP at 2793. Instructions 26 through 28 must be read with jury instruction 30, the to-

convict instruction:

> To convict the Defendant of the crime of Assault in the 1st Degree
> as charged in Count 6, each of the following elements of the crime must be
> proved beyond a reasonable doubt:
> 1) That on or about June 3rd, 2019, the Defendant assaulted Isaiah
> Holloway;
> 2) That the assault was committed with a firearm;
> 3) That the Defendant acted with intent to inflict *great* bodily harm;
> and
> 4) That this act occurred in the County of Okanogan, in the State of
> Washington.

RP at 2794-95 (emphasis added).

Lance Bowers highlights that jury instruction 28 listed three definitions of assault

and none of them inserted the word "great" before "bodily injury." Nevertheless, jury

instruction 30 surefootedly informed the jury that it could not convict Bowers of the

crime of first degree assault without the intent to cause "great bodily harm." Instruction

27 reinforced the need to find an intent to inflict "great bodily harm" by defining the

term.

To satisfy the constitutional demands of a fair trial, jury instructions, when read as

a whole, must correctly tell the jury of the applicable law, not be misleading, and permit

the defendant to present his theory of the case. *State v. O'Hara*, 167 Wn.2d 91, 105, 217

P.3d 756 (2009). Jury instruction 28, combined with other instructions, correctly told the

jury of the applicable law, was not misleading, and permitted Lance Bowers to present

his theory of the case.

Jury Instruction 29

Lance Bowers argues that jury instruction 29 relieved the State of its burden to

prove he acted with the specific intent to inflict great bodily injury on Sheriff Deputies

Tait Everett and Isaiah Holloway. Jury instruction 29 defined "bodily injury" without

refining the term with the modifier "great." The instruction provided:

> Bodily injury means physical pain or injury, illness, or impairment
> of physical condition.

RP at 2794. According to Bowers, jury instruction 29 confused the jury by supplying an

alternate definition to "bodily injury."

We answer similarly to our response to Lance Bowers' challenge to jury

instruction 28. Jury instruction 30 explicitly instructed the jury that, in order to convict

Bowers of first degree assault, it had to find beyond a reasonable doubt that he assaulted

the officers with the intent to inflict "great bodily harm." Although instruction 29

contained the definition of "bodily injury," that definition aided the jury in understanding

the type of conduct that constituted an "assault," as the term was defined in instruction

28. All reasonable jurors possessed the ability to read the instructions as a whole and

conclude that a finding of the intent to inflict great bodily harm was an element of first

degree assault.

State Comments on Bowers' Silence

Lance Bowers accuses the State of misconduct by breaching his Fifth Amendment right to remain silent. He argues that the State's attorney explicitly invited the jury to infer guilt because he did not, after his arrest, explain that he did not kill his wife, but rather that his brother shot Angela Bowers. Bowers adds that the prosecuting attorney's misconduct was ill-intentioned and flagrant because, for years, Washington decisions have precluded the State from relying on the accused's silence as evidence of guilt. The remarks were particularly ill-intentioned because the prosecutor knew that the evidence against Joe Bowers was the same as the evidence against Bowers. Finally, Bowers summarily contends the misconduct prejudiced him.

Lance Bowers does not contend that, assuming the State commented on his pre-arrest silence, the State violated his Fifth Amendment right. He insists that all challenged statements concerned postarrest silence.

In response, the State asserts that its trial counsel only referenced Lance Bowers' silence before his arrest. In turn, the State argues that, after *Salinas v. Texas*, 570 U.S. 178, 133 S. Ct. 2174, 186 L. Ed. 2d 376 (2013) and *State v. Magana*, 197 Wn. App. 189, 389 P.3d 654 (2016), the State may rely on prearrest silence as substantive evidence of guilt. It also asseverates that some of the challenged statements referenced flight, resistance, and lack of cooperation, not silence.

The State further argues that Lance Bowers waived the assignment of error because he did not object to the prosecutor's remarks at trial. Along these lines, Bowers cannot show that any misconduct was flagrant and incurable. Finally, the State contends any error was harmless.

The United States and the Washington State Constitutions protect the right of an accused to remain silent. *State v. Burke*, 163 Wn.2d 204, 206, 181 P.3d 1 (2008). The Fifth Amendment of the United States Constitution and article I, section 9 of the Washington Constitution guarantee that individuals will not be compelled by the government to incriminate themselves. *State v. Escalante*, 195 Wn.2d 526, 531-32, 461 P.3d 1183 (2020). When the State invites the jury to infer guilt from the invocation of the right of silence, the State breaches the right to remain silent. *State v. Burke*, 163 Wn.2d 204, 217 (2008); *State v. Pinson*, 183 Wn. App. 411, 417, 333 P.3d 528 (2014).

In addition to enjoying a right to be moot after an arrest, a criminal defendant need not take the stand at his own trial or even assert the Fifth Amendment in the presence of the jury. *Griffin v. California*, 380 U.S. 609, 613–15, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). A criminal defendant has an absolute right not to testify. *Griffin v. California*, 380 U.S. 609, 613–15 (1965).

Absent an express invocation of the right to silence, the Fifth Amendment is not an obstacle to the State's introduction of a suspect's pre-arrest silence as evidence of guilt. *Salinas v. Texas*, 570 U.S. 178 (2013); *State v. Magana*, 197 Wn. App. 189, 195

(2016).  Conversely, the State may not mention a defendant's mootness once law enforcement places him in custody.  *State v. Pinson*, 183 Wn. App. 411 (2014).  A suspect is in custody if a reasonable person in the suspect's position would consider his or her freedom curtailed to the degree associated with a formal arrest.  *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004).

Lance Bowers would have reasonably understood himself to be in police custody when the officers drew their guns and yelled commands at him.  He no longer enjoyed freedom to leave his location.  The State could not employ his silence thereafter as evidence of guilt without the officers administering the *Miranda* warnings.

Lance Bowers identifies five statements of the prosecuting attorney that purportedly breached his privilege for silence.  We summarily dismiss the first statement uttered by counsel during opening statement because the prosecutor mentioned Bowers' silence during a conversation with his son Darren Bowers.  During opening statement, the State's counsel commented that Bowers conversed with his son by phone from the jail on June 11, 2019.  When son Darren confronted his father with having killed his mother, Bowers did not deny the accusation.  Instead, Bowers ended the call.

During this phone conversation, Lance Bowers sat in custody, but he voluntarily spoke with his son, not with a law enforcement officer in a coercive setting.  The Fifth Amendment privilege only extends to a "police-dominated atmosphere."  *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 110 L. Ed. 2d 243 (1990).  Neither the

Fourth, Fifth, nor Sixth Amendment protects a suspect who speaks with a confidant. *State v. Sanders*, 452 S.W.3d 300, 314–15 (Tenn. 2014). The State may even introduce a confession to a friend or relative who is cooperating undercover with law enforcement. *State v. Willis*, 496 S.W.3d 653, 698 (Tenn. 2016).

In a Washington decision, *State v. Denton*, 58 Wn. App. 251, 792 P.2d 537 (1990), Shannon Denton voluntarily called a law enforcement officer from jail to speak with the officer about his charges. The court refused to suppress Denton's remarks to the officer since Denton initiated the call and could have ended the conversation at any time. The Fifth Amendment was not implicated.

Darren Bowers stated his father killed his mother, rather than Lance Bowers directly confessing to the homicide. Nevertheless, a party can manifest adoption of a statement by silence. *State v. Neslund*, 50 Wn. App. 531, 550, 749 P.2d 725 (1988). Because of the inherently equivocal nature of silence, such evidence must be received with caution. *State v. Baruth*, 47 Wash. 283, 292, 91 P. 977 (1907). Silence constitutes an admission only if (1) the party heard the accusatory or incriminating statement and was mentally and physically able to respond; and (2) the statement and circumstances were such that a reasonable person would conclude the party would have responded had there been no intention to acquiesce. *State v. Goodwin*, 119 Wash. 135, 140–41, 204 P. 769 (1922).

In addition to commenting, during opening statement, about the June 11 phone conversation between Lance Bowers and his son, the State played the recording of the conversation to the jury during trial. Bowers initially objected to the playing of the recording because of a lack of authentication, but, with more foundation, Bowers stipulated to the playing. On appeal, Bowers does not object to the playing of the recording. We should not entertain an assignment of error to a prosecutor's statement when the appellant stipulated to the evidence on which the prosecutor based his comments.

We move to the prosecution's summation. Although the parties may suggest otherwise, they do not dispute the law so much as they dispute the breadth and meaning of the prosecuting attorney's comments. The dispute centers on whether the closing statement remarks implicated silence before or after the arrest.

The State's attorney intoned:

> Let's talk about the murder. Defense Counsel argues at length that apparently his brother killed Angela. *What evidence did he provide to you? Say something.* One thing. The fact that he was there?

RP at 2919 (emphasis added). We encounter some difficulty following this passage. One could conclude that the State's counsel was telling the jury that Lance Bowers should have said something in order to prove he did not commit the murder by testifying at trial. We conclude, at the least, that the State's counsel sought to impress the jury with the thought that Bowers' silence after the arrest—his failure to implicate his brother after his

33

incarceration—showed guilt.  We agree with Bowers that this extract principally, if not

exclusively, implicated his post-arrest silence.  More grievously, the quote could have

adverted to Bowers' refusal to testify at trial.  The comment suggested that Bowers

needed to personally say something in the form of trial testimony.

In one passage, the State's attorney uttered at least three challenged statements

implicating Lance Bowers' silence:

> [W]hy at any point didn't the Defendant call the police? . . .
> How many opportunities did he have to say his brother, not him,
> killed Angela? . . .
> Why didn't he call the police?

RP at 2920-21.  We conclude that the first and third excerpts referenced only a time

before Bowers' arrest.  Only Shannon Denton telephones the police while in police

custody.  The second excerpt implicates both a time before and after Bowers' arrest.  A

reasonable listener to the rhetorical question would conclude that the State sought to

incriminate Bowers for not, after his arrest, identifying his brother as the killer to law

enforcement.

Contrary to the State's argument, none of the State's attorney's comments

involved flight.  Lance Bowers did not flee from law enforcement at any time.  We agree

with the State that some of Bowers' actions showed resistance and lack of cooperation.

When asked to show his hands, Bowers only revealed one.  Nevertheless, Bowers does

34

not challenge the State presenting evidence of his conduct when apprehended by

Deputies Everett Tait and Isaiah Holloway.

We conclude that, on two occasions, the State's counsel infringed on Lance

Bowers' Fifth Amendment right. Counsel argued that Bowers needed to say something

to exculpate himself, and counsel did not limit this obligation to speak to a time before

the arrest. Counsel questioned how many opportunities Bowers had available to cast

guilt on his brother, and, again, counsel did not limit these opportunities to an interval

before incarceration. This last remark by counsel suggested that Bowers needed to testify

at trial.

The State argues that the remarks by its counsel did not suggest guilt because of a

failure to testify, but were merely comments on the lack of evidentiary support for Lance

Bowers' defense. The State may do the latter. *State v. Jackson*, 150 Wn. App. 877, 885-

86, 209 P.3d (2009). We disagree that counsel limited his comments to a lack of

evidence supporting Bowers' defense. Counsel argued that Bowers needed to talk to the

police after his arrest, if not testify at trial, in order to disprove the State's case. A

defendant has no duty to present evidence; the State bears the entire burden of proving

each element of its case beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 361, 90

S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Fleming*, 83 Wn. App. 209, 215, 921 P.2d

1076 (1996). Thus, the State may not suggest to the jury that the defendant carries any

burden to prove his innocence. *State v. Traweek*, 43 Wn. App. 99, 107, 715 P.2d 1148 (1986).

We have concluded that the State's attorney's remarks violated Lance Bowers' Fifth Amendment right. This court must still decide whether the prosecutor committed misconduct, the level of any misconduct, and whether the misconduct prejudiced Bowers. In this regard the panel divides. One of our members concludes that the prosecuting attorney did not commit misconduct because a jury instruction could have cured any possible prejudice by reason of the prosecuting attorney's violation of Bowers' right to silence. The other members of the panel conclude that the prosecuting attorney committed misconduct because of court precedent precluding comments on silence and because a jury instruction would not have cured the misconduct. These other members conclude, however, that Bowers did not suffer prejudice because of the overwhelming evidence of guilt.

The defendant bears the burden of proving both prosecutorial misconduct and prejudice from the misconduct. *State v. Furman*, 122 Wn.2d 440, 455, 858 P.2d 1092 (1993); *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Arguments by the prosecution that shift or misstate the State's burden to prove the defendant's guilt beyond a reasonable doubt constitute misconduct. *State v. Lindsay*, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). Finding misconduct only begins our analysis, however.

To prevail on appeal on a claim of prosecutorial misconduct when the defense objected below, a defendant must show first that the prosecutor's comments were improper and second that the comments were prejudicial. *State v. Warren*, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). If defense counsel fails to object to the misconduct at trial, the defendant on appeal must show more than a misstatement of the law and some prejudice. Washington courts consider the claim of prosecutorial misconduct waived on appeal unless the misconduct is so flagrant and ill-intentioned that it evinces an enduring prejudice the trial court could not have cured by an instruction. *State v. Gregory*, 158 Wn.2d 759, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W. R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014); *State v. Evans*, 163 Wn. App. 635, 642-43, 260 P.3d 934 (2011). Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill-intentioned and more on whether the resulting prejudice could have been cured. *State v. Crossguns*, 199 Wn.2d 282, 299, 505 P.3d 529 (2022). In this respect, the law conflates the element of prejudice with the underlying element of flagrant and ill-intentioned conduct.

Because Lance Bowers' trial attorney did not object to the prosecuting attorney's remarks during the opening or closing arguments, the controlling rule tasks this court with determining whether the prosecuting attorney's misconduct was flagrant and ill-intentioned and whether Bowers suffered enduring prejudice. "Ill-intention" means having malicious intentions. Dictionary.com, http://www.dictionary.com/browse/ill-

intentioned (last visited October 10, 2024). "Flagrant" is something considered "wrong

or immoral[,] conspicuously or obviously offensive." Oxford English Dictionary Online,

https://en.oxforddictionaries.com/definition/flagrant (last visited October 10, 2024).

Assessing whether prosecutorial misconduct was flagrant and ill-intentioned imposes an

embarrassing and difficult duty on a reviewing court. Nevertheless, despite the terms

flagrant and ill-intentioned evoking the state of mind of the actor, our Supreme Court

directs us not to delve into the mind of the prosecutor. The Supreme Court has written

that we should not focus on the prosecutor's subjective intent in committing misconduct,

but instead on whether the defendant received a fair trial in light of the prejudice caused

by the violation of existing prosecutorial standards and whether that prejudice could have

been cured with a timely objection. *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 463

(2015); *State v. Emery*, 174 Wn.2d 741, 762 (2012). To repeat, one of our panel

members would end the analysis with a decision that a timely objection or curative

instruction could have expunged any prejudice from the violation of the right to remain

silent.

The one panel member relies on *State v. Crossguns*, 199 Wn.2d 282, 505 P.3d 529

(2022). On appeal, Patrick Crossguns argued that the prosecutor committed misconduct

when informing the jury, during summation, that it possessed the duty to discern whether

Crossguns or his victim told the truth. Prior case law held such an argument was

improper. The Supreme Court reversed Crossguns' conviction, but on other grounds.

The court summarily stated that the prosecuting attorney's misstatement could have been cured by an instruction. Had Crossguns timely objected, the court could have properly explained the jury's role and reiterated that the State bears the burden of proof and the defendant bears no burden.

The law affords a reviewing court few guidelines and standards for determining either the subjective or objective intentions of the prosecuting attorney. Nevertheless, at least two Washington courts have noted one factor to consider when determining if improper prosecutorial arguments were flagrant and ill-intentioned. An argument should be so characterized when a Washington court previously recognized the same argument as improper in a published opinion. *State v. Johnson*, 158 Wn. App. 677, 685, 243 P.3d 936 (2010); *State v. Fleming*, 83 Wn. App. 209, 213-14 (1996).

We recognize that *Johnson* and *Fleming* are Court of Appeals' decisions, not Supreme Court decisions. Nevertheless, the Supreme Court has never disapproved of the rule applied in *Johnson* and *Fleming*. The Supreme Court also has not removed from consideration the nature of the conduct of the prosecuting attorney as opposed to the consequences of the misconduct when adjudging prosecutorial misconduct.

In *State v. Loughbom*, 196 Wn.2d 64, 470 P.3d 499 (2020), the State reversed a conviction for delivery and conspiracy to deliver a controlled substance because of the prosecuting attorney's references to the war on drugs. Trial defense counsel had not objected to the references. When announcing that the prosecuting attorney had

39

committed misconduct, the Supreme Court noted that the State's attorney repeatedly

mentioned a war on drugs. The court also, however, referenced four earlier Court of

Appeals decisions condemning a State's attorney's remarks about the war on drugs,

which cases Gregg Loughbom's prosecutor should have heeded.

We do not know the intentions of Lance Bowers' prosecuting attorney.

Nevertheless, two members of this panel conclude, based on *Johnson* and *Fleming*, the

prosecutor engaged in flagrant and ill-intentioned conduct. Numerous published

decisions before the date of trial declared that the prosecuting attorney must not reference

the accused's silence when in custody. A prosecutor's suggestion that the defendant must

speak at trial to absolve himself of guilt forms a more egregious error.

We acknowledge that the Washington Supreme Court recognizes the import of

curative instructions, but we, as have other courts, still question the effectiveness of

curative instructions. *State v. Robinson*, 24 Wn.2d 909, 917, 167 P.2d 986 (1946).

*Krulewitch v. United States*, 336 U.S. 440, 453, 69 S. Ct. 716, 93 L. Ed. 790 (1949)

(Jackson, J. concurring), quoted in *State v. Arredondo*, 188 Wn.2d 244, 280, 394 P.3d

348 (2017) (Gonzalez, J. dissenting); *State v. Newton*, 109 Wn.2d 69, 74 n.2, 743 P.2d

254 (1987); *State v. Craig*, 82 Wn.2d 777, 789, 514 P.2d 151 (1973) (Stafford, J.

dissenting). Two members of the court deem that, in this setting, an instruction would

not have erased from the mind of one or more jurors the view that Lance Bowers should

have spoken. The intonation of "say something" plants a subliminal seed that, if Bowers

is not guilty, he should explain why. We might argue that the prosecuting attorney's comments could apply to both pre-arrest silence and post-arrest silence such that this court should not consider the conduct flagrant. Counsel, however, based on well-established law, should have known to be careful when imputing guilt to the defendant and to be certain to limit any comments to the pre-arrest window of time. The one comment mentioned the numerous opportunities afforded to Bowers to exculpate himself by blaming his brother. Those opportunities naturally extended beyond the arrest. Counsel faulted Bowers for not saying anything at any time.

Remember that, in the end, the defendant must show the prosecutorial misconduct resulted in enduring prejudice, if counsel raised no objection. To repeat, the rule of prosecutorial misconduct applied when there is a failure to object is often phrased as requiring the defendant to demonstrate that the prosecutor's remark was so flagrant and ill-intentioned that no curative instruction would have been capable of neutralizing the resulting prejudice. *State v. Loughbom*, 196 Wn.2d 64, 70 (2020). We might question the ability to determine if an instruction could cure any prejudice, but we decide the appeal on an alternative basis.

Washington courts also employ another test for a new trial that may or may not be consistent with the curative instruction standard. In analyzing prejudice resulting from prosecutorial misconduct, we do not look at the comments in isolation, but in the context of the total argument, the issues in the case, the evidence, and the instructions given to

the jury. *State v. Warren*, 165 Wn.2d 17, 28 (2008); *State v. Yates*, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). When applying this standard, the court usually measures the strength of the State's evidence of guilt. *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015). Even if the defendant shows misconduct, this court will not reverse unless we discern a substantial likelihood that the misconduct affected the jury's verdict. *State v. Stenson*, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997); *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). Our entire court agrees that the prosecuting attorney's remarks on silence did not affect the verdict.

The State presented overwhelming evidence that Lance Bowers killed his wife. Bowers has unsuccessfully sought to limit the discussion, on appeal, of accomplice liability. If Bowers did not kill Angela Bowers, Joe Bowers did with Bowers' assistance.

Lance Bowers had a motive to kill. He resided at the location of death with his wife Angela Bowers. Police confiscated, from Bowers, the gun that fired the bullets. Bowers had an opportunity to steal the gun from his mother. Someone cut the Alumbaughs' security monitoring system, and the person with access to the system was Bowers. Bowers cleaned the site of the murder with bleach. Bowers disposed of the corpse in his car. He attempted to cremate the body by igniting the car. The prosecutor's comments of Bowers' failing to accuse Joe Bowers had little importance because of the overwhelming evidence against Bowers. Even if Joe was guilty, Bowers would be guilty also.

The State argues that it did not commit constitutional error such that we use the lower standard of harmless error. We disagree, but find harmless error even under a constitutional standard. When a prosecutor's improper comments directly violate a defendant's constitutional right, courts apply the constitutional harmless error standard to analyze claims of prosecutorial misconduct. *State v. Teas*, 10 Wn. App. 2d 111, 122, 447 P.3d 606 (2019); *State v. Emery*, 174 Wn.2d 741, 757 (2012). A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error and when the untainted evidence is so overwhelming it necessarily leads to a finding of guilt. *State v. Burke*, 163 Wn.2d 204, 222 (2008). For the reasons already stated, we are convinced beyond a reasonable doubt that the comments on Bowers' silence did not impact the jury verdict.

Cross-Examination of Isaiah Holloway

Lance Bowers argues that the trial court violated his Sixth Amendment right to confront witnesses when the court forbade him from cross-examining Deputy Isaiah Holloway about his discipline, after the shooting, from the Okanogan County Sheriff's Office. The discipline sanctioned Holloway for engaging in an intimate relationship with a young woman, not his wife, involved in criminal activity and then allegedly protecting the woman from arrest. Both the relationship and disciplinary action occurred after the shooting. Bowers argues that the disciplinary action was relevant for impeachment purposes.

The confrontation clause of the Sixth Amendment guarantees the right to impeach prosecution witnesses with evidence of bias. *Davis v. Alaska*, 415 U.S. 308, 316–18, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State v. Johnson*, 90 Wn. App. 54, 69, 950 P.2d 981 (1998). The Washington Supreme Court has articulated a three-prong test for evaluating alleged violations of the Sixth Amendment's Confrontation Clause and of the right to present defense evidence. First, the evidence must be minimally relevant. *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). The second prong shifts the burden to the State and requires it to show the evidence sought to be admitted by the defense is so prejudicial as to disrupt the fairness of the fact-finding process at trial. *State v. Darden*, 145 Wn.2d 612, 621 (2002). Third, the court balances the State's interest to exclude prejudicial evidence against the defendant's need for the information sought. The trial court may withhold the evidence only if the State's interest outweighs the defendant's need. *State v. Darden*, 145 Wn.2d 612, 621 (2002).

Lance Bowers advances the evidence of Deputy Isaiah Holloway's relationship and resulting disciplinary action as bearing relevance because Holloway testified that Bowers pointed the gun at himself and Sergeant Everett. According to Bowers, Holloway fabricated either Bowers' aiming of the gun at the sheriff deputies or exaggerated the impact of the confrontation in order to deflect blame for his misconduct with the woman. He claimed trauma from the alleged crossfire as impacting his mental

health, which, in turn, led to the sexual tryst. According to Bowers, Holloway had not mentioned Bowers' aiming of the gun before the discipline.

Lance Bowers misrelates some of the facts. On June 5, three days after the shooting and before Sheriff Deputy Isaiah Holloway's extramarital misconduct, Holloway wrote in a report:

> Lance looked at us and took his left hand out of his left front pocket and pointed to the sky. I heard Lance say God while pointing to the sky. I then observed Lance moving his right arm and drawing a revolver from his right front pocket. I could see K9 Havoc running towards Lance. Lance began to raise the firearm. At that time I felt Lance was an imminent threat to kill or seriously injure myself or Sgt. Everett. I began to aim my firearm at Lance and could see the revolver moving above K9 Havoc's head. The revolver was above Lance's waist at that time. I discharged my firearm until I observed Lance drop the revolver on the shoulder of the roadway and he then fell into the ditch.

CP at 277. Holloway did not explicitly state that Bowers pointed the gun at him, but the report suggests that Bowers raised the firearm toward the officers. Because Holloway's testimony aligned with what he wrote in the report, no fabrication occurred. The evidence of Holloway's later misconduct lacked relevance to the prosecution.

## Victim Penalty Assessment

Lance Bowers argues that his victim penalty assessment must be stricken because Washington law no longer allows trial courts to impose the assessment on an indigent defendant. In response, the State faults Bowers for failing to cite, in his opening brief, to the page of the clerk's papers confirming his indigency. RAP 10.3 requires citation to the

record to establish a fact.  The State concedes, however, that, if Bowers can establish the trial court entered a finding of indigency, the change in the law requires vacating the victim penalty assessment.  In his reply brief, Bowers cites to the page in the record wherein the trial court found indigency.

A change in this state's law on criminal procedure took effect on July 1, 2023. Courts apply a new rule for the conduct of criminal prosecutions to all cases, state or federal, pending on direct review or not yet final.  *In re Personal Restraint of Eastmond*, 173 Wn.2d 632, 634, 272 P.3d 188 (2012).

Beginning on July 1, 2023, Washington courts may no longer impose a victim penalty assessment on a defendant "if the court finds that the defendant is indigent at the time of sentencing."  FINAL B. REP. ON ENGROSSED SUBSTITUTE H.B. 1169, at 2, 68th Leg., Reg. Sess. (Wash. 2023); *see* LAWS OF 2023, ch. 449, §§ 1, 4.  Additionally, "[u]pon motion, the court must waive any crime victim penalty assessment previously imposed against an adult defendant who does not have the ability to pay.  A person does not have the ability to pay if the person is indigent."  FINAL B. REP. ON ENGROSSED SUBSTITUTE H.B. 1169, at 2 *See* LAWS OF 2023 ch. 1169, § 1, 4.

Lance Bowers filed his appeal on July 13, 2022.  Because his direct appeal was pending when the change in the law took effect, the new law applies and this court must strike the victim penalty assessment if the trial court found Bowers indigent at the time of

sentencing.  Because the record establishes that the trial court made such a finding, we direct the erasure of the assessment.

## CONCLUSIONS

We affirm Lance Bowers' convictions.  We remand for the trial court to strike the victim penalty assessment.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

I CONCUR:

_____
Cooney, J.

No. 39032-2-III

STAAB, A.C.J. (concurring) — I agree with the majority's conclusion, affirming Lance Bowers's convictions for crimes related to the death of his wife. I write separately on the issue of prosecutorial misconduct. The majority concludes that the prosecutor's closing argument, suggesting that Bowers failed to produce evidence and failed to testify, was flagrant misconduct, but affirms after concluding that the error did not have a substantial likelihood of affecting the verdict. I disagree with the majority's analysis of prejudice. I would conclude that the error here was curable and it is unnecessary to determine whether the error affected the verdict. Still, I agree with the majority's outcome that the error is not reversible.

As the majority notes, a criminal defendant claiming prosecutorial misconduct has the burden, on appeal, of showing error and resulting prejudice. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). When the alleged error is not race-based, and the defendant failed to object at trial, the error is deemed waived "unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id*. at 760-61; *see State v. Bagby*, 200 Wn.2d 777, 522 P.3d 982 (2023) (providing separate test for race-based misconduct).

Here, I agree that the prosecutor improperly suggested that the jury could infer guilt from Bowers's post-arrest silence and failure to testify. Thus, the only question is whether Bowers can show that the error is reversible under the elevated standard articulated in *Emery*.

The elevated standard of "flagrant and ill-intentioned" has been around since at least 1966 when the Supreme Court held:

> Unless the misconduct of counsel in his opening statement is so flagrant, persistent [and] ill-intentioned, or the wrong inflicted thereby so obvious, and the prejudice resulting therefrom so marked and enduring, that corrective instructions or admonitions clearly could not neutralize their effect, any objection to such misconduct of counsel or error in the opening statement is waived by failure to make adequate timely objection and request for a corrective instruction or admonition.

*State v. Morris*, 70 Wn.2d 27, 33, 422 P.2d 27 (1966). Over the years, this standard has been reduced to the "flagrant and ill-intentioned" standard, which suggests a focus on the prosecutor's subjective intent in putting forth evidence or making a statement.

Our Supreme Court has pushed back against the tendency to focus on the prosecutor's subjective intent. Instead, the court has repeatedly instructed that "'[r]eviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *State v. Crossguns*, 199 Wn.2d 282, 299, 505 P.3d 529 (2022) (quoting *Emery*, 174 Wn.2d at 762); *see also State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015) ("We do not focus on the prosecutor's subjective intent in committing misconduct, but

2

instead on whether the defendant received a fair trial in light of the prejudice caused by the violation of existing prosecutorial standards and whether that prejudice could have been cured with a timely objection.").

"Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Most errors are curable by instruction. Incurable prejudice has only been found "in a narrow set of cases where we were concerned about the jury drawing improper inferences from the evidence." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018). The Supreme Court has recognized reversible misconduct under this heightened standard when the misconduct is either so inflammatory that it threatens the fundamental fairness of trial, or when it is so severe as to demonstrate that it was flagrant and ill intentioned. *See Phelps*, 190 Wn.2d at 171.

In *Emery*, the prosecutor made two erroneous arguments. First, the prosecutor argued that in order to acquit, the jury must be able to say, "I doubt the defendant is guilty, and my reason is blank." 174 Wn.2d at 750-51. Second, the prosecutor argued that the "truth of these charges" is that the defendant was guilty and then charged the jury with "speak[ing] the truth" by holding the defendants accountable. *Id*. at 751. The

3

Supreme Court agreed that both arguments were improper. Nevertheless, in affirming the conviction, the court noted that objections are necessary to correct the error, prevent it from reoccurring, and to prevent abuse of the appellate process. *Id.* at 761-62. Conversely, "[a]n objection is unnecessary in cases of incurable prejudice only because 'there is, in effect, a mistrial and a new trial is the only and the mandatory remedy.'" *Id.* at 762 (quoting *State v. Case*, 49 Wn.2d 66, 74, 298 P.2d 500 (1956)).

In *Crossguns*, the Court affirmed the heightened standard noted in *Emery* and instructed reviewing courts to focus on whether the misconduct was curable. 199 Wn.2d at 299. In that case, the prosecutor twice told jurors "it was their job to determine who was lying and who was telling the truth." *Id*. at 298. The court found that had the defendant objected, the trial court would have explained the jury's proper role and reiterated the State's burden of proof. *Id*. at 300. Such an instruction would have been sufficient to eliminate any confusion and cure the potential prejudice from the prosecutor's improper remarks. *Id*. at 300.

The majority relies on *Fleming* to hold that the prosecutor's argument was flagrant because it had been previously held to be improper. Majority at 38-39. This reasoning focuses on the prosecutor's intent and suggests that the prosecutor was flagrantly ignoring precedent to make an improper argument. The Supreme Court has repeatedly held that we should avoid this analysis. Indeed, the improper comment found to be flagrant and reversible in *Fleming* was almost identical to the improper argument later

4

found to be curable in *Crossguns*. *See State v. Fleming*, 83 Wn. App. 209, 213, 921 P.2d 1076 (1996) (improper for a prosecutor to tell the jury that it must find the State's witnesses are lying in order to acquit); *Crossguns*, 199 Wn.2d at 297.

Here, the misconduct does not "come close to the level of severity our precedent suggests is necessary to meet the 'flagrant and ill intentioned' standard." *Phelps*, 190 Wn.2d at 171. Instead, it was just as curable as the misconduct found in *Emery* and *Crossguns*. Had Bowers objected, the court could have reminded the jury that Bowers had no duty to prove anything and had a constitutional right not to testify at trial. This would have cured the error and prevented it from reoccurring.

_____
Staab, A.C.J.